**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **HUTCHESON MEDICAL CENTER, INC.,** | ) | **Jointly Administered Under** |
| **et al.,** | ) | **CASE NO. 14-42863-pwb** |
| | ) | |
| Debtors. | ) | |

**NOTICE OF FILING ASSET PURCHASE AGREEMENT WITH MAYBROOK
HEALTHCARE LLC AS PROPOSED STALKING HORSE AGREEMENT**

COME NOW Ronald Glass, duly appointed Chapter 11 Trustee for the bankruptcy estates

of Hutcheson Medical Center, Inc., ("**HMC**") and Hutcheson Medical Division, Inc., ("**HMD**")

(hereinafter, collectively, the "**Debtors**") in the above-styled jointly administered case (the

"**Case**"), and files the attached Asset Purchase Agreement with Maybrook Healthcare LLC (the

"**Maybrook Agreement**").    The Maybrook Agreement is hereby substituted for the Asset

Purchase Agreement with Hutcheson Healthcare & Rehab, LLC filed with the Court on October

20, 2016 [Dkt. 383] as the proposed stalking horse agreement in connection with the Motion (A)

For Authority To Sell Assets Free And Clear Of Liens, Claims, And Encumbrances filed on

October 13, 2015 [Dkt. 367].

This 30th day of October, 2015.

| | |
|---|---|
| 1500 Candler Building | Respectfully submitted, |
| 127 Peachtree Street, NE | |
| Atlanta, GA 30303 | SCROGGINS & WILLIAMSON, P.C. |
| T: (404) 893-3880 | |
| F: (404) 893-3886 | |
| E: rwilliamson@swlawfirm.com |   /s/ J. Robert Williamson |
|   aray@swlawfirm.com | J. ROBERT WILLIAMSON |
|   hkepner@swlawfirm.com | Georgia Bar No. 765214 |
| | J. HAYDEN KEPNER, JR. |
| | Georgia Bar No. 416616 |
| | |
| | *Special Counsel for the Trustee* |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") dated _____ ___, 2015 (the "Effective Date") is executed by and between **HUTCHESON MEDICAL CENTER, INC.**, a Georgia Non-Profit Corporation and **HUTCHESON MEDICAL DIVISION, INC.**, a Georgia Corporation (collectively, the "Seller" or the "Debtor"), by and through the Trustee, as defined hereinbelow, and **MAYBROOK HEALTHCARE LLC**, a New York limited liability company (the "Purchaser").

## RECITALS:

WHEREAS, Seller owns and operates (a) a 109 bed skilled nursing facility known as Parkside at Hutcheson Nursing Home (the "Parkside Facility") and (b) 16 skilled nursing beds (the "Sub Acute Beds", together with the Parkside Facility, the "Nursing Home") located in Hutcheson Medical Center, which is a licensed 179 bed acute care hospital (the "Hospital");

WHEREAS, the Parkside Facility  is located on a portion of real property at 100 Gross Crescent Circle, Fort Oglethorpe, GA 30742, consisting of approximately 4.84 acres as described more particularly in Exhibit "A" to this agreement, together with all improvements thereto (the "Nursing Home Property");

WHEREAS, on or about November 20, 2014 (the "Petition Date"), Seller filed Chapter 11 Case No. 14-42863-pwb (the "Case") in the United Stated Bankruptcy Court for the Northern District of George, Rome Division (the "Court");

WHEREAS, on September 21, 2015, an order was entered in the Case approving the appointment of Ronald Glass (the "Trustee") as the Chapter 11 Trustee for the Debtor's bankruptcy estate (the "Estate"), and in such capacity the Trustee is authorized to act on the Debtor's behalf as the representative of the Estate;

WHEREAS, in addition to the Nursing Home and the Hospital, Seller also operates (a) a facility housing an Ambulatory Surgery Center, Lab and Cancer Center (collectively, the "ASC") located on a six acre campus on Battlefield Parkway, (b) six outpatient clinics at various locations in Dade, Walker and Catoosa Counties (collectively, the "Clinics"), and (c) two smaller office buildings located on the Nursing Home Property (the "Office Buildings");

WHEREAS, as of the Petition Date, the Hospital Authority of Walker, Dade and Catoosa Counties (the "Authority") held title to the Nursing Home Property and related improvements at which the Nursing Home is operated, including the Hospital;

WHEREAS, as of the Petition Date, the Seller leased the Parkside Facility and the Hospital from the Authority under a Lease Agreement dated January 24, 1995, which is currently scheduled to expire on May 31, 2036 (the "Lease");

{1171/001/00150050.2}

WHEREAS, the Authority has agreed to convey its interest in the Nursing Home Property, and all improvements thereon, to the Seller, free and clear of all liens and encumbrances, including but not limited to any liens, mortgages, mechanic's liens, or accrued and unpaid taxes, other than any easements, rights-of-way, and similar interests existing as of the Petition Date;

WHEREAS, Seller desire to sell its interest in the Nursing Home, including the Nursing Home Property, through the use of sale procedures under 11 U.S.C. § 363 to be approved by the Court in the Case;

WHEREAS, Seller and Purchaser desire to enter into this Agreement in order for Purchaser to serve as a "stalking horse bidder" in Seller's sale of the Nursing Home and Nursing Home Property;

WHEREAS, subject to the terms of this agreement and subject to the terms of the Bidding Procedures Order and the Sale Approval Order described herein, when issued, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, what is described herein as the "Purchased Assets".

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements hereinafter contained, the parties hereto, each intending to be legally bound hereby, agree as follows:

## ARTICLE I – CONVEYANCE AND ACQUISITION

1.1.    Agreement to Convey and Acquire.  Subject to the terms and conditions set forth in this Agreement, at the Closing Date, Seller shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all liens (other than recorded easements, rights-of-way, and similar interests agreed to by the parties in writing, the "Permitted Exceptions"), and Purchaser shall purchase, acquire and take assignment and delivery from Seller, for the consideration and in the manner specified herein, all of Seller's right, title and interest of any kind and nature in and to the Nursing Home Property and all the properties, assets and rights of every kind and nature of Seller used primarily in connection with the Nursing Home, including existing licenses and permits, equipment, furniture, records, computer data, motor vehicles, and other tangible personal property and intangible property, and fixtures necessary to operate the Nursing Home as a duly licensed skilled nursing facility, in Ft. Oglethorpe, Georgia (the "Purchased Assets") other than the Excluded Assets (as defined in Section 1.2 herein).  At Closing (as defined in Section 3.1 herein), Seller shall provide (a) a Bill of Sale, the form of which is attached hereto as Exhibit "B" (the "Bill of Sale"), conveying to Purchaser all of Seller's right, title, and interest and to all of the Purchased Assets, and (b) an Assumption and Assignment Agreement, the form of which is attached hereto as Exhibit "C" (the "Assignment"), transferring and assigning to Purchaser all of Seller's right, title, and interest in and to any Assumed Contracts (defined below), and (c) a trustee's or similar deed, the form of which is attached hereto as Exhibit "D" (the "Trustee's Deed"), conveying to Purchaser good and marketable title to the Nursing Home Property, free and

{1171/001/00150050.2}

clear of all liens and encumbrances, including but not limited to any liens, mortgages, mechanic's liens, or accrued and unpaid taxes, other than any easements, rights-of-way, and similar interests existing as of the Petition Date.

      1.2.   Excluded Assets.   Anything in this Agreement to the contrary notwithstanding, the Purchased Assets shall not include any of the Assets described in the list of assets attached as Exhibit "E" hereto, including, without limitation, cash on hand, causes of action, utility deposits, accounts receivable and any real or personal property or other assets pertaining to the operations of the Hospital, the Clinics, the ASC or the Office Buildings (collectively, the "Excluded Assets"). Further, Purchaser acknowledges and agrees that Seller does not own the real property on which the Hospital, including the Sub Acute Beds, is located and therefore cannot and does not warrant or represent that either the Seller or the Purchaser will be able to continue operating the Sub Acute Beds at the Hospital.

      1.3.   Transfer of Resident Trust Funds and Property.

          1.3.1.   Resident Trust Funds.  On or prior to the Closing Date, Seller shall provide to Purchaser a true, correct and complete accounting (properly reconciled), certified as being true, correct and complete by Seller, of any patient trust funds, if any, held by Seller prior to the Closing Date for residents at the Nursing Home ("Resident Trust Funds").

          1.3.2.   Transfer and Assumption.  Seller hereby agree to transfer to Purchaser the Resident Trust Funds on the Closing Date. Seller shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Resident Trust Funds. Purchaser hereby represents, warrants and agrees that they will accept and hold the Resident Trust Funds in trust for the residents, and shall comply with all applicable statutes, rules and regulations. Within fifteen (15) business days after the Closing Date, Seller and Purchaser will reconcile the Resident Trust Funds transferred from Seller to Purchaser.

          1.3.3.   Liability of Parties.  Purchaser shall not have responsibility to the applicable resident/responsible party and regulatory authorities to the extent that the Resident Trust Funds delivered by Seller to Purchaser pursuant to this Section 1.3 with respect to any resident are demonstrated to be less than the full amount of the Resident Trust Funds for such resident as of the Closing Date or for claims which arise from actions or omissions of Seller with respect to the Resident Trust Funds prior to the Closing Date. Purchaser shall notify Seller of any discrepancies within fifteen (15) business days after the Closing Date. Seller agrees to indemnify, defend and hold harmless Purchaser from any Losses which Purchaser may incur as a result of discrepancies between the Resident Trust Funds as delivered by Seller to Purchaser and the full amount of the Resident Trust Funds for such resident as of the Closing Date. Except for any discrepancies between the Resident Trust Funds as delivered by Seller to Purchaser and the full amount of the Resident Trust Funds for such resident as of the Closing Date, Purchaser agrees to indemnify, defend and hold harmless Seller from any

Losses which Seller may incur as the result or arising from any action or inaction of Purchaser in respect of the Resident Trust Funds from and after the Closing Date.

    1.4.    <u>Purchase Price</u>.

        1.4.1.  <u>Bidding Price</u>.  Purchaser's purchase price for the Purchased Assets shall be Seven Million and Two Hundred Thousand Dollars ($7,200,000.00) (the "<u>Initial Bid</u>"), plus or minus the credits and prorations set forth in this Agreement.

        1.4.2.  <u>Transfer of Purchase Price</u>.  If Purchaser is the successful bidder at the Auction (as defined below), on the Closing Date (as defined below), Purchaser shall transfer the amount of the successful bid, plus or minus credits and prorations set forth in this Agreement (the "<u>Purchase Price</u>"), less the Purchaser's Deposit, to Seller in immediately available funds, as set forth more fully in Section 3.2 (c) below.

    1.5.    **<u>Liabilities Not Assumed by the Purchaser.</u>**  Except as otherwise expressly provided in this Agreement, Purchaser shall not assume or incur any liability, expense, or obligation of any kind associated with (a) the Nursing Home with respect to time periods on or before the Closing Date, (b) the operation of the Nursing Home prior to the Closing Date, (c) the Nursing Home for acts or omissions or business activities occurring prior to the Closing Date, (d) claims against or liability that relate to any of the Excluded Assets, or (e) liabilities for any state or federal taxes (other than transfer taxes) imposed on or with respect to the Purchased Assets for any pre-Closing tax period. Except as expressly provided in this Agreement, Purchaser shall not assume any claims, lawsuits, liabilities, contracts, obligations or debts of Seller, whether statutory, regulatory, judicially created or constitutional, including without limitation: (a) malpractice or other tort claims, statutory or regulatory claims, claims of state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller occurring before the Closing Date; (b) any accounts payable, taxes, or other obligation or liability of Seller to pay money incurred by Seller on or prior to the Closing Date; (c) any contracts, whether executory in nature or otherwise, (d) any collective bargaining agreements or other union-related agreements entered into by Seller or its predecessors; and (e) any other obligations or liabilities arising in whole or in part from Seller's acts or omissions prior to the Closing Date. It is specifically understood and agreed that Purchaser is not assuming any Georgia franchise permit fee (i.e. bed tax) liabilities or any overpayments or defaults (including but not limited to any refunds, repayments or unpaid civil money penalties arising prior to the Closing Date and due to the Medicare or Medicaid programs) of Seller.

    1.6.    <u>Good Faith Deposit</u>.  By no later than one (1) business day after execution, unless such date is extended in writing by the parties hereto and consented to by Regions Bank and the official committee of unsecured creditors appointed in the Case (the "<u>Deposit Deadline</u>"), Purchaser shall pay to Seller a good faith deposit in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00) ("<u>Purchaser's Deposit</u>") by wire transfer of immediately available funds.  Notwithstanding anything else in this Agreement, if the Purchaser's Deposit is not received in full by the Trustee by the

Deposit Deadline, this Agreement shall be null and void.  Purchaser's Deposit shall be held in a separate escrow account under the custody and control of Seller or its counsel. The provisions of this Section will be incorporated into the Bidding Procedures Order described in Section 3.2, and such Bidding Procedures Order shall provide that the Purchaser's Deposit shall not be deemed to constitute property of the bankruptcy estate of Seller (the "Estate"), and the Estate shall have no interest of any kind (equitable or otherwise) in the Purchaser's Deposit unless and until such deposit is actually paid or payable to Seller in accordance with this Agreement.  If the Closing occurs, then the Purchaser's Deposit shall be paid to Seller in accordance with Section 3.2 (c) hereof. Subject to Section 9.4, Purchaser's Deposit shall only become nonrefundable and become property of the Seller if Purchaser fails to satisfy its obligations under this Agreement. Seller shall return Purchaser's Deposit to Purchaser if any of the following events occur: (a) if the Bidding Procedures order described in Section 2.2 is not approved by the Court on or before 5:00 p.m., prevailing Eastern time, on the thirtieth (30th) day following the Effective Date and Purchaser terminates this Agreement in writing on account thereof, (B) if Purchaser is not the successful bidder or back-up bidder at the Auction,  (C) Purchaser is the successful bidder at the auction, but the court does not approve the sale of the Purchased Assets to the Purchaser, or (D) Purchaser terminates this Agreement pursuant to Section 9.4.1(b).

     1.7.    Prorations and Credits.  The following will be prorated as of the Closing Date and shall be settled by a credit against the Purchase Price at the Closing:

     1.7.1. Taxes.   Accrued but unpaid general real estate and other ad valorem and special taxes affecting the Purchased Assets and any other real and personal property taxes, if any, for all years up to the Closing Date.

     1.7.2. Utilities.  Seller shall pay all utility charges attributable to the Purchased Assets through and including the day preceding the Closing Date.  Charges and deposits for water, fuel, gas, oil, heat, electricity and other utility and operating charges and prepaid service contracts will be based upon the last available invoice.  Seller will obtain final utility meter readings as close as possible to the Closing Date.  All utility deposits as of the Closing will be refunded to Seller.

1.8.    Medicare Provider Numbers; Final Cost Reports.

1.8.1.   Medicare Provider Numbers.  Effective on the Closing Date and to the extent assignable, Seller shall sell, assign and convey to Purchaser the Medicare provider numbers in use at the Nursing Home (the "Existing Medicare Provider Number").  Purchaser shall be permitted to bill under the Existing Medicare Provider Number during the period commencing on the Closing Date and through the date of the issuance of the Medicare tie-in-notice (the "Transition Period").  Seller shall execute any and all documents necessary to and will otherwise cooperate in connection with the assignment of the Existing Medicare Provider Numbers.  Notwithstanding the foregoing, Seller retains any and all rights and liabilities relating to the existing Medicare Provider Number for any and all periods prior to the Closing Date.

1.8.2.   Final Cost Reports.  As soon as practicable, an in all cases within ninety (90) days following the Closing Date, Seller shall prepare and file with the appropriate Medicare and Medicaid agencies their final cost reports with respect to its operation of the Nursing Home prior to the Closing Date required to be filed pursuant to Titles XVIII and XIX of the Social Security Act prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to Purchaser for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Seller' failure to timely file such final cost reports.  Seller shall use commercially reasonable efforts to modify on or before thirty (30) days following the Closing Date, any existing direct deposit arrangement which Seller has in connection with the operation of the Nursing Home so that such funds are delivered to Purchaser after that date.

1.9.    Contracts; Resident Agreements; Assumed Liabilities.

1.9.1.   Contracts.  No later than ten (10) days following entry of the Bidding Procedures Order and no later than fifteen (15) days prior to the Auction, Seller shall deliver to Purchaser true, accurate and complete copies of all material written equipment leases, service or maintenance contracts and agreements or other agreements affecting the Nursing Home, including, without limitation, any pharmacy, therapy, managed care and employment contracts (collectively, the "Contracts").

1.9.2.   Assumed and Rejected Contracts.  Subject to entry of the Sale Order and concurrent with the Closing Date, this Agreement shall be deemed an assignment of the rights, title and interest by Seller, and an assumption of the duties and obligations by Purchaser, of each of the Contracts, except with respect to such Contracts that Purchaser shall deliver written notice to Seller, with such notice delivered at least five (5) days prior to the Auction, that Purchaser does not wish to assume (the Contracts assumed hereunder shall hereinafter be referred to as the "Assumed Contracts", and the Contracts not assumed by Purchaser shall be referred to as the "Rejected Contracts").

Purchaser shall not be responsible for any liabilities and obligations under the Rejected Contracts and Purchaser shall have no obligation to assume any of the Contracts.

       1.9.3.   Contract Consent.  To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Seller agree to use commercially reasonable efforts to obtain such third party consent prior to the Closing Date.

       1.9.4.   Resident Agreements.  Seller shall also transfer, convey and assign to Purchaser on the Closing Date all existing agreements with residents and, to the extent assignable, any guarantors thereof ("Resident Agreements").

## ARTICLE II – ACTIONS IN THE CASE

      2.1.   Auction.  In accordance with the Bidding Procedures Order (as defined in Section 2.2), Seller will sell the Purchased Assets at a public auction (the "Auction") utilizing the procedures specifically set forth the sale procedures set forth in such Bidding Procedures Order.

      2.2.   Bidding Procedures.  Either before or promptly following the Effective Date, Seller will file a motion (the "Sale Motion") with the Court in the Case, in form and substance reasonably acceptable to Purchaser, for entry of an order (the "Bidding Procedures Order") approving the transaction contemplated hereby and the procedures for bidding at the Auction in form reasonably acceptable to counsel for Purchaser (the "Bidding Procedures").

      2.3.   Other Bids.  Purchaser acknowledges that, pursuant to the Bidding Procedures Order, Seller will solicit bids from or more other prospective purchasers for the sale of some or all of the Purchased Assets in accordance with the procedures set forth in the Bidding Procedures Order.

      2.4.   Break Up Fee.  If Purchaser is not the winning bidder at the Auction and if Seller sells all or substantially all of the Purchased Assets described herein to another bidder unrelated to Purchaser, then at or immediately following Seller's closing of such sale to another bidder, Seller shall pay to Purchaser a break up fee in an amount equal to Two Hundred and Sixteen Thousand Dollars ($216,000.00) (the "Break Up Fee") as a limited bid protection and as payment in full of due diligence costs and expenses.

      2.5.   Waiver of Challenge Rights.  If, for any reason, Purchaser is not the successful bidder at the Auction and/or does not ultimately acquire the Purchased Assets at Closing, Purchaser agrees that, in consideration for the Break-Up Fee and other consideration provided hereunder and under the Sale Motion and Bidding Procedures Order, it shall not challenge, attempt to prevent, hinder, delay or frustrate Seller's transfer of any or all of the Purchased Assets to another transferee, and absent any intentional misconduct on the part of Seller, Purchaser hereby irrevocably waives any all rights to bring such a challenge.  Purchaser acknowledges that Seller and the Purchased Assets

{1171/001/00150050.2}

will be irreparably harmed by Purchaser's failure to comply with this provision of the Agreement and agrees that Seller shall be entitled to equitable relief against Purchaser in the form of an injunction, specific performance, or otherwise.

### ARTICLE III – CLOSING, ITEMS TO BE DELIVERED, THIRD PARTY CONSENTS, AND FURTHER ASSURANCES

    3.1.  <u>Closing</u>.  The closing ("<u>Closing</u>") of the sale and purchase of the Purchased Assets shall take place within ten (10) days after the later to occur of (a) the Court's entry of an order in the Case approving the sale of the Purchased Assets to the Purchaser in accordance the outcome of the Auction (the "<u>Sale Approval Order</u>"), and (b) Purchaser's receipt of all necessary regulatory approvals, which the Purchaser will use its best efforts to obtain as soon as possible . The Closing shall be scheduled at a time and location agreed upon by Seller and Purchaser. The date of the Closing is sometimes herein referred to as the "<u>Closing Date</u>." The parties agree that time is of the essence in this transaction and that the Closing Date will occur no later than sixty (60) days after the entry of the Sale Approval Order unless, after having used its best efforts, the Purchaser has been unable to obtain all necessary regulatory approvals by such date, in which case the Seller will agree to extend the Closing Date for an amount of time reasonably necessary for the Seller to obtain such regulatory approvals, but in no event to a date later than an additional sixty (60) days. Seller's agreement to such an extension shall not be unreasonably withheld.

    3.2.  <u>Items to be Delivered at Closing</u> At the Closing, the following events will occur:

        3.2.1.  <u>Bill of Sale</u>. Seller will deliver to purchaser the Bill of Sale, fully executed by Seller, conveying to Purchaser all of the Seller' right, title and interest in, to and under all personal property included in the Purchased Assets, free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances securing indebtedness.

        3.2.2.  <u>Trustee's Deed</u>. Seller will deliver to purchaser the Trustee's Deed, fully executed by Seller, conveying to Purchaser good and marketable title to the Nursing Home Property<u>, free and clear of all liens and encumbrances, including but not limited to any liens, mortgages, mechanic's liens, or accrued and unpaid taxes, other than any easements, rights-of-way, and similar interests existing as of the Petition Date</u> included as Permitted Exceptions.

        3.2.3.  <u>Assignment</u>. Seller will deliver to Purchaser the Assignment, fully executed by Seller and Purchaser, providing for (i) the assignment to Purchaser of all of Seller's right, title and interest in, to and under the Assigned Contracts, (ii), and (ii) the assumption by Purchaser of all of Seller's obligations which arise on and after the Closing relating to the interests assigned under the Assigned Contracts.

3.2.4. <u>Payment</u>. On the Closing Date, Purchaser shall pay the Purchase Price in immediately available funds, by release of the Purchaser's Deposit and by payment of the balance of the Purchase Price, plus or minus credits and prorations provided for in this Agreement, by wire transfer of immediately available funds to and account designated in writing by Seller.

3.2.5. <u>Closing Certificate and Documents.</u>

3.2.5.1.    <u>Seller's Certificate</u>. Seller shall deliver to Purchaser a certificate executed by a duly authorized representative of Seller certifying as to the matters set forth in Section 6.2 and Section 6.3; and

3.2.5.2.    <u>Purchaser's Certificate</u>. Purchaser shall deliver to Seller a certificate executed by a duly authorized representative of Purchaser certifying as to the matters set forth in Section 7.1 and Section 7.2.

3.2.5.3.    <u>Execution and Delivery of Agreements</u>. Seller and Purchaser shall execute and deliver such other instruments, documents or agreements (in each case, in a form reasonably satisfactory to each such party) that are reasonably required in order to properly and orderly consummate, give effect to, and close the transactions contemplated by this agreement. Simultaneously with such delivery, all such steps will be taken as may be required to put the Purchased Assets in actual possession and operating control of Purchaser.

3.3.    <u>Further Assurances</u>. Seller from time to time after the Closing, at no cost to Seller, upon Purchaser's request, will execute, acknowledge and deliver to Purchaser such other instruments of conveyance and transfer and will take such other actions as Purchaser may reasonable require in order to vest more effectively in the Purchased Assets and to implement the transaction contemplated by this agreement. Seller reserve the right to seek or require advance approval of the Court with respect to any request from Purchaser under this Section 3.3.

3.4.    <u>Pre-Closing Covenants.</u>

3.4.1. <u>Seller's Covenants</u>. Subject to the Bankruptcy Code, the Bidding Procedures Order or any other applicable orders of the Bankruptcy Court with respect to each of the following subparagraphs, Seller hereby agrees and covenants to Purchaser that, unless otherwise indicated, between the Effective Date and the Closing Date, except as otherwise contemplated by this Agreement or with the prior written consent of Purchaser:

3.4.1.1.    Between the Sale Order date and the Closing Date, Seller will cooperate with Purchaser in connection with its efforts to obtain the skilled nursing facility license for the Nursing Home (the "<u>License</u>") and permitting Purchaser to operate and maintain 109 skilled nursing beds at the Parkside Facility and 16 Sub Acute Beds at Hutcheson Medical Center, and in that regard, Seller agrees, promptly upon

request by Purchaser, to execute any reasonable applications or notifications required in connection with such efforts. Seller agrees to promptly provide or make available to Purchaser, upon request and to the extent such documentation is within Seller's possession or control, any and all existing documentation requested by DHS or otherwise necessary for the issuance of the License.

3.4.1.2.    Between the Sale Order date and the Closing Date, Seller shall use commercially reasonable efforts to assist Purchaser in seeking timely to obtain any necessary third party consents for the valid conveyance, transfer, assignment or delivery of the Purchased Assets being transferred to Purchaser per the terms of this Agreement and Seller specifically agrees to provide reasonable cooperation to Purchaser in connection with obtaining, enrolling or receiving an assignment of any provider agreement or third party payor contract related to the Nursing Home.

3.4.1.3.    Seller will not make any changes in the normal and ordinary operation of the Nursing Home from the Effective Date through the Closing Date, except as may be required in connection with the Case. Seller shall not amend, revise or modify any existing personal property lease for any of the Purchased Assets except for Rejected Contracts. Subject to the Sale Approval Order, Seller shall deliver the Purchased Assets on the Closing Date, free and clear of all liens, claims, charges and encumbrances, other than the Permitted Exceptions, in substantially the same condition and repair as in existence on the Effective Date, normal wear and tear excepted.

3.4.1.4.    There will be no change in ownership, operation or control of any of the Purchased Assets prior to Closing, and Seller will not take any action inconsistent with material obligations under this Agreement.

3.4.1.5.    Seller will maintain in force or renew on commercially reasonable terms the existing hazard and liability insurance policies as are now in effect for all of the Purchased Assets.

3.4.1.6.    Seller will maintain the inventories of perishable food, non-perishable food, central supplies, linen, housekeeping and other supplies at the Parkside Facility at substantially the same condition and quantity as presently maintained, but in no event less than required by any applicable Georgia rules and regulations.

3.4.1.7.    Between the Sale Order date and the Closing Date, during normal business hours and upon not less than twenty-four (24) hours prior notice, Seller will provide Purchaser and its representatives with access to the Nursing Home and the Purchased Assets.

3.4.1.8.    Seller will cause all of the Purchased Assets to be operated in compliance with all applicable laws, regulations and ordinances as are now in effect and take all actions reasonably necessary to achieve compliance with any laws, regulations and ordinances which are enacted after execution of this Agreement and prior to Closing, except to the extent it would not otherwise have a material adverse effect on

the Purchased Assets or require Seller to make capital improvements to the Parkside Facility.

        3.4.1.9.     Seller will promptly notify Purchaser in writing of any material adverse change of which Seller become aware in the condition of the Purchased Assets, including, without limitation, delivery to Purchaser and Purchaser within three (3) business days of receipt: (A) copies of all surveys and inspection reports from any governmental agencies received after the Effective Date; and (B) notices received of any action pending, threatened or recommended by the appropriate state or federal agency having jurisdiction thereof to revoke, withdraw or suspend any right of Seller to operate the Nursing Home, to terminate the participation of the Nursing Home in the Title XVIII or Title XIX of the Social Security Act programs, or to take any action that would have a material adverse effect on Purchaser's ability to purchase and operate the Nursing Home as a skilled nursing facility.

## ARTICLE IV – REPRESENTATION AND WARRANTIES

    4.1.   <u>Representations and Warranties of Seller</u>.  Seller, hereby represents and warrants to Purchaser as follows:

        4.1.1.  <u>Status and Good Standing</u>.  Seller is vested with full power and authority to enter into this agreement.  Seller is a Georgia Nonprofit Corporation duly formed and validly existing under the laws of the State of Georgia, and is duly qualified to own the Purchased Assets and conduct business in the State of Georgia.

        4.1.2.  <u>Authorization</u>.

        4.1.2.1.     To the extent applicable in light of the appointment of the Trustee in the Case, the execution, delivery and performance by Seller of this agreement and the other agreements to be entered into by Seller  pursuant to the terms of this Agreement, and the consummation by Seller of the transactions contemplated hereby and thereby are within Seller's corporate powers  (and will be in accordance with the powers granted to Seller under the Sale Approval Order if and when entered), are not in contravention of the terms of Seller's documents of formation, and subject to obtaining the Sale Approval Order, have been duly authorized and approved by all necessary parties, tribunals, or individuals from whom such authorization and approval is required to consummate the transaction contemplated by this Agreement. Subject to obtaining the Sale Approval Order, no other corporate proceedings on the part of Seller are necessary to authorize the execution, delivery and performance of this Agreement or any other agreement to be entered into by Seller pursuant to the terms of this Agreement.

        4.1.2.2.     Subject to the Sale Approval Order, this Agreement has been duly and validly executed and delivered by the Trustee on behalf of Seller.  As of the Closing, the other agreements and instruments to be entered into or executed by Seller pursuant to the terms of this Agreement will have been duly and validly executed and delivered by the Trustee on behalf of Seller.  Subject to obtaining the Sale Approval

Order described in Section 2.2, this Agreement constitutes (and upon their execution and delivery by Seller, the other agreements to be entered into pursuant to the terms of this Agreement by Seller will constitute) the legal, valid and binding obligations of Seller enforceable against Seller in accordance with its terms (assuming the valid authorization, execution and delivery hereof and thereof by Purchaser) subject to bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

      4.1.3.  <u>Validity of Contemplated Transactions</u>.  Subject to Seller obtaining the Sale Approval Order from the Court, and except as otherwise set forth herein, delivery and performance of this Agreement by Seller does not and will not violate, conflict, with or result in the breach of any term, condition or provision of, or require the consent of any other person under (a) any applicable existing law, ordinance, or governmental rule or regulation to which Seller is subject, (b) any applicable judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Seller, (c) the charter documents of Seller, or (d) Governmental Approval, or other instrument, document or understanding, oral or written, to which Seller is a party, by which Seller may have rights or by which the Nursing Home may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of Seller thereunder.  Except as aforesaid, subject to Seller obtaining the Sale Approval Order from the Court, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery or performance of this Agreement by Seller.

      4.1.4.  <u>Title to Purchased Assets</u>.  Pursuant to the Sale Approval Order, Seller has good, valid and marketable title to the Purchased Assets, and subject to the terms and conditions of the Sale Approval Order if and when entered, Seller will transfer the Purchased Assets at Closing free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances securing indebtedness.

      4.1.5.  <u>Limited Warranty</u>.  Purchaser acknowledges that it is presently engaged in operations similar to those to be conducted at the Nursing Home and has expertise in such industry sufficient to observe open and obvious defects.  Purchaser acknowledges that in deciding to enter into this Agreement, Purchaser has not relied on any representations or warranties, express or implied, of any kind from Seller as to the presence or absence of open and obvious defects or nonmaterial defects.  Purchaser has investigated the premises, and assumes all responsibility and cost for the correction of any observed or unobserved deficiencies or violations at the Nursing Home so long as the same (i) are open and obvious, (ii) are disclosed by Seller in writing at least ten (10) days prior to the Closing Date, or (iii) have a total cost to repair or replace that does not exceed $10,000.

{1171/001/00150050.2}

4.1.6.  <u>Contracts</u>.  Subject to the entry of the Sale Order, Seller has the power and authority to assign each of the Assigned Contracts and Resident Agreements to Purchaser.

4.1.7.  <u>Compliance with Applicable Laws</u>.  The Purchased Assets (including any parking areas or facilities) have been and are presently used and operated in material compliance with, and in no way violate in any material respects any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Purchased Assets or any part thereof, including without limitation, any statutes or laws pertaining to the services and care provided for the residents at the Nursing Home, and any rules or regulations promulgated thereunder ("Applicable Laws"), or any Permitted Exceptions.

4.1.8.  <u>Residents</u>.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Nursing Home is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls.

4.1.9.  <u>HIPAA</u>.  Seller have not received notice that, with respect to the Nursing Home, it is not in material compliance with the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations.

4.2.  <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller as follows:

4.2.1.  <u>Company Existence</u>.  Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the state of New York.

4.2.2.  <u>Company Power and Authorization</u>.

4.2.2.1.    The execution, delivery and performance by Purchaser of this Agreement and the other agreements to be entered into by it pursuant to the terms of this Agreement, and the consummation by Purchaser of the transaction contemplated hereby and thereby are within Purchaser's company powers, are not in contravention of the terms of Purchaser's respective documents of formation, and have been duly authorized and approved by the members of Purchaser.  No other company proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance of this Agreement or any other agreement to be entered into by Purchaser pursuant to the terms of this Agreement.

4.2.2.2.    This Agreement has been duly and validly executed and delivered by Purchaser.  As of the Closing, the other agreements and instruments to be entered into or executed by Purchaser pursuant to the terms of this Agreement will have been duly and validly executed and delivered by Purchaser.  This Agreement constitutes (and upon their execution and delivery by Purchaser the other agreements to be entered into pursuant to the terms of this Agreement by Purchaser will constitute) the

legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereby by Seller).

        4.2.3.  <u>Validity of Contemplated Transactions, etc.</u>   The execution, delivery and performance of this agreement by Purchaser does not and will not violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any party to, (a) any existing law, ordinance, or governmental rule or regulation to which Purchaser is subject, (b) any judgment, order, writ, injunction, decree, or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Purchaser, or (c) the articles of organization of Purchaser.  Except as aforesaid, no authorization, approval or consent of, and no registration or filing with, and governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by Purchaser.

        4.2.4.  <u>Sufficiency of Funds</u>.  Purchaser has unencumbered cash on hand or credit arrangements with financially responsible third parties, or a combination thereof, in an aggregate amount sufficient to enable Purchaser to pay the Purchase Price and all other amounts payable by Purchaser in connection with this Agreement and the transactions provided for within.

## ARTICLE V – AGREEMENTS PENDING CLOSING

    5.1.    <u>Cooperation of the Parties Pending Closing</u>.  The parties will use their reasonable best efforts to cause all of the conditions to the obligations of Purchaser and Seller under this Agreement to be satisfied after the Court's entry of the Sale Approval Order.  Without limiting the generality of the foregoing, and in supplementation thereof, the parties covenant and agree that, pending the Closing and except as otherwise agreed to in writing, the parties shall cooperate to cause all of the conditions to the obligations of Purchaser and Seller under this Agreement to be satisfied within the time specified above and will not knowingly take any action that would result in a breach of any of these representations and warranties.

    5.2.    <u>Employees.</u>

        5.2.1.  <u>Continuing Employees</u>.  It is the intent of Purchaser to make offers of employment on an at-will basis to substantially all of employees of the Nursing Home (the "Continuing Employees") on the Closing Date so that Seller is not required to give notice to employees of the Nursing Home of the "closure" thereof under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any other comparable state law; *provided, however*, that Purchaser shall have the right to conduct customary employee background checks prior to offering employment to any such employee, and each employee shall be required, as a prerequisite of beginning and continuing employment with Purchaser, to successfully complete an application and a sixty (60) day probationary period pursuant to Purchaser's policies and procedures.  Continuing Employees shall include, but not be limited to, any employees who are on medical

disability or leaves of absence and who worked at the Nursing Home immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation, and who are qualified for the position. Seller will terminate the employment of all employees as of 11:59 p.m. the night before the Closing Date.

       5.2.2.   <u>Communication with Employees</u>.  Purchaser may, in its sole and absolute discretion, after being selected the successful bidder at the Auction, on or before the Closing Date, meet with the employees to have them complete any necessary employment and enrollment forms.  On and after the entry of the Sale Order, Purchaser shall have access to the employees which it intends to make Continuing Employees for reasonable training of such employees, provided that such training shall not materially distract from the ordinary operation of the Nursing Home.

       5.2.3.   <u>WARN Act Indemnification</u>.   Purchaser and Seller agree to indemnify, defend and hold harmless the other party from any losses which the other party may incur under the WARN Act or any comparable state law in the event of the violation by such party of its obligations under Sections 5.2; *provided, however,* that nothing herein shall be construed as imposing any obligations on Purchaser to indemnify, defend or hold harmless Seller from any losses that it may incur under the WARN Act as a result of the acts or omissions of Seller prior to the Closing Date, it being understood and agreed that Purchaser shall only be liable for its own acts and omissions from and after 12:01 a.m. on the Closing Date.

       5.2.4.   <u>Health Insurance Obligations</u>.  Effective as of the Closing Date, Seller shall make available group health plan continuation coverage pursuant to the requirements of Section 601, et seq. of ERISA and Section 4980B of the Internal Revenue Code, as amended ("COBRA"), to all of the employees to whom it is required to offer the same under applicable law.  Seller acknowledges and agrees that Purchaser is not assuming any of Seller's obligations to its employees and/or qualified beneficiaries under COBRA or otherwise, except as specifically provided in this Section 5.2.  As of 12:01 a.m. on the Closing Date, all employees: (i) who participated as of 11:59 p.m. the night before the Closing Date, in group health coverage sponsored by Seller (a summary of which group health plan shall be provided to Purchaser) and (ii) who become Continuing Employees, shall be eligible for participation in a group health plan established and maintained by Purchaser for the general benefit of its employees and their dependents, and all such Continuing Employees shall, under the plan of Purchaser, be covered without a waiting period and without regard to any pre-existing condition unless (x) they are under a waiting period with Seller at or before 11:59 p.m. the night before the Closing Date, in which case they shall be required to fulfill their waiting period in accordance with the terms of Purchaser's benefit plan or (y) they were subject to a pre-existing condition exclusion while under Seller's group-health plan, in which case they shall be subject to the same exclusion while in Purchaser's group health plan or in accordance with the terms of Purchaser's benefit plan.  Notwithstanding the foregoing, Purchaser shall use commercially reasonable efforts to obtain waivers of any applicable waiting period or pre-existing condition exclusions.

{1171/001/00150050.2}

   5.2.5. <u>Payroll and Benefit Obligations</u>.  Seller shall pay to each employee in the normal course of business on the next scheduled pay date an amount equal to any and all accrued salary (including any any paid time off) earned by such employee after the Petition Date and up to (but not including) the Closing Date.   Purchaser shall have no obligation to any employee of the Sellers for any wages, salaries, benefits, reimbursements or any other obligations for services that were rendered prior to the Closing Date.

   5.2.6. <u>No Employment Contract</u>.  Nothing in this Agreement shall create any rights in favor of any person not a party hereto, including the employees or Continuing Employees, or constitute an employment agreement or condition of employment for any employee of Seller or any affiliate of Seller.

   5.2.7. <u>Employment Records</u>.  Seller shall leave at the Nursing Home either the originals or full and complete copies of all employee records for all Retained Employees in their possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records").

## ARTICLE VI – CONDITIONS PRECEDENT TO CLOSING OBLIGATIONS OF PURCHASER

  6.1. All obligations of Purchaser under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

   6.1.1. <u>Regulatory Approvals</u>.  Purchaser's receipt of approval from the applicable governmental authorities for the issuance of the authorizations, consents, licenses or permits identified on Schedule 6.1a. (each a "<u>Regulatory Approval</u>"). Schedule 6.1a. has been prepared by Purchaser with the agreement and understanding that other than as shown on Schedule 6.1a., there are no other consents, licenses, permits, or approvals of any other governmental agencies or entities which are conditions precedent to the obligations of Purchaser to consummate the transaction which is the subject of this Agreement.  Purchaser will not seek any authorizations, consents, licenses, permits, or approvals of governmental agencies or entities other than those shown on Schedule 6.1a., if doing so would reasonably be expected to cause a delay in Purchaser's ability to obtain prior to the Closing those Regulatory Approvals listed on Schedule 6.1a.

   6.1.2. <u>Representation and Warranties True as of the Closing Date</u>.  The representations and warranties of Seller contained in this Agreement of in any schedule, pursuant to the provisions hereof shall be true on the Closing Date with the same effect as though such representations and warranties were made as of such date.

6.1.3.  <u>Compliance with the Agreement</u>.  Seller shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with my Seller prior to or at the Closing.

6.1.4.  <u>Threatened or Pending Litigation</u>.  On the Closing Date, aside from the Case, no other suit, action or other proceeding, or injunction of final judgment relating thereto, shall be threatened or be pending before any court or Governmental Body in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened, which, in either case,  are not subject to the automatic stay under 11 U.S.C. §362.  No action or proceeding has been instituted or to Seller' knowledge threatened before any court or governmental body or authority the result of which could materially and adversely affect Purchaser's ability to operate the Nursing Home as a skilled nursing facility with the same number and type of Licensed Beds as currently existing.  There are no orders which are entered after execution of this Agreement and prior to Closing and which shall result in the immediate forced closing of the Nursing Home prior to the Closing Date.

6.1.5.  <u>Auction Result</u>.  Purchaser shall have been the successful bidder or back-up bidder at the Auction.

6.1.6.  <u>Court Approval</u>.  The Court shall have entered the Sale Approval Order in the form of a final order approving the sale of the Purchased Assets to Purchaser.

6.1.7.  <u>Transfer of Title</u>.  Seller shall have obtained  title in the Nursing Home Property, and all improvements thereon, from the Authority, and shall have been granted the authority by the Court to transfer good and marketable title in the same to Purchaser free and clear of all liens and encumbrances, including but not limited to any liens, mortgages, mechanic's liens, or accrued and unpaid taxes, other than any easements, rights-of-way, and similar interests existing as of the Petition Date included as Permitted Exceptions.

## ARTICLE VII – CONDITIONS PRECEDENT TO CLOSING OBLIGATION OF SELLER

7.1.    All obligations of Seller under this Agreement to transfer the Purchased Assets on the Closing Date are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

7.1.1.  <u>Representations and Warranties True as of the Closing Date</u>.  The representations and warranties of Purchaser contained in this Agreement or in any list, certificate or document delivered by Purchaser to Seller pursuant to the provisions hereof shall be true on the Closing Date with the same effect as though such representations and

warranties were made as of such Date with the same effect as though such representations and warranties were made as of such date.

7.1.2. <u>Compliance With This Agreement</u>.    Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Purchaser prior to or at the Closing.

7.1.3. <u>No Threatened or Pending Litigation</u>.  On the Closing Date, aside from the Case, no other suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or Governmental Body in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened which, in either case, are not subject to the automatic stay under 11 U.S.C. §362.

7.1.4. <u>Constituent Documents</u>.  Purchaser shall have delivered to Seller true and complete copies of Purchaser's documents of formation.

7.1.5. <u>Auction Result</u>.  Purchaser shall have been the successful bidder or back-up bidder at the Auction.

7.1.6. <u>Court Approval</u>.  The Court shall have entered the Sale Approval Order in the form of a final order approving the sale of the Purchased Assets to Purchaser.

7.1.7. <u>Transfer of Title</u>.  Seller shall have obtained title in the Nursing Home Property, and all improvements thereon, from the Authority, and shall have been granted the authority by the Court to transfer good and marketable title in the same free and clear of all liens and encumbrances, including but not limited to any liens, mortgages, mechanic's liens, or accrued and unpaid taxes, other than any easements, rights-of-way, and similar interests existing as of the Petition Date included as Permitted Exceptions.

## ARTICLE VIII – POST CLOSING MATTERS

8.1.    <u>Medicare/Medicaid Issues</u>.  As appropriate before or after the Closing, Seller shall cooperate with Purchaser, at no cost to Seller, to effect an orderly change of ownership in respect to licensed and Medicare and Medicaid program certification, if any, including, but not limited to, Purchaser's completion and execution of all such documents as are necessary after the Closing to permit Purchaser to apply for a license, or transfer of a license, from the State of Georgia.

8.2.    <u>Transfer of Computer Data</u>.  On or before the Closing Date, Seller shall cooperate with Purchaser to transfer the data pertaining exclusively to the employees and residents at the Nursing Home in the electronic format currently utilized by Seller for downloading to Purchaser's computers.  Seller shall also cooperate with Purchaser in the

conversion of therapy-related data from Seller's database(s) to Purchaser's database, and shall sign all paperwork reasonably necessary to effectuate transfer of the same. On the Closing Date, all such transferred data shall become the exclusive property of Purchaser to the extent permitted by applicable law.

8.3.    <u>Compliance</u>.    The parties acknowledge and recognize their status, responsibilities and obligation as health care providers and covered entities, as those terms are defined in the privacy and security regulations issued under HIPAA, and contained in 45 C.F.R. Parts 160 and 164 (the "<u>Regulations</u>"). The parties agree to comply therewith (and, in particular, Section 164.506 of the Regulations, which provides, *inter alia*, the permitted uses and disclosures of protected health information for the purposes of another covered entity's treatment, payment or health care operations) as well as all other federal and state laws and regulations, in the execution and operation of this Agreement.

8.4.    <u>Access to Purchased Assets</u>.    Seller shall, at its own expense, be entitled to retain copies of any and all of the books and records of the Purchased Assets following the Closing and to use the information contained therein for all purposes relating, directly or indirectly, to the Case and the winding down of the Seller's Estate. In addition to the foregoing, Purchaser shall afford Seller reasonable access, upon reasonable notice during normal business hours or at other reasonable times, to books and records included within the Purchased Assets in order for Seller to administer and wind down its bankruptcy estate in the Case.

8.5.    <u>Seller's Maintenance of Existing Records</u>.    Seller agrees to maintain all Nursing Home records, including medical records and personnel records for patients and employees no longer residing or working at the facility as of the Closing Date, whether in storage or its own databases, including, but not limited to, former resident records and records of resident funds, for a period of ten (10) years from the date of the record, or as otherwise required by applicable law or regulation.

## ARTICLE IX – MISCELLANEOUS

9.1.    <u>Use of Names and Telephone Numbers</u>.    Purchaser may use the current name, internet domain name and present telephone and facsimile numbers of the Nursing Home. Seller shall as of the Closing Date cooperate with Purchaser in its transfer, at Purchaser's expense, of all right, title and interest, if any, in and to the names currently in use at the Nursing Home, or any derivations thereof, and the telephone and facsimile numbers used by the Nursing Home.

9.2.    <u>Accounts Receivable; Accounts Payable</u>.

9.2.1.    <u>Pre-Closing Receivables</u>.    Seller shall retain the right to collect all accounts receivable that are for services provided prior to the Closing Date with respect to the Nursing Home.

9.2.2.  <u>Undesignated Receivables</u>.   The parties acknowledge that substantially all remittance advices related to Medicare and Medicaid reimbursement designate a period of service.  To the extent Seller receives any payments for accounts receivable and the accompanying remittance advice or other payer designation does not indicate the period to which a payment relates or if there is no accompanying remittance advice or other payer designation, then the parties will make good faith, reasonable efforts to determine  the period to which such payment relates and if, following such good faith, reasonable efforts the parties cannot make such a determination, and the parties do not otherwise agree as to how to apply such payment, then, the parties will be deemed to have agreed that: (a) any undesignated payments received during the first sixty (60) days after the Closing Date shall be applied first to pre-Closing Date balances until such balances have been reduced to zero, and any remaining portion shall be applied to post-Closing Date balances and (b) any undesignated payments received after the sixtieth (60th) day after the Closing Date shall be applied first to post-Closing Date balances until such balances as of the date of funds' application have been reduced to zero, with any remaining portion applied to any existing pre-Closing Date balances.

9.2.3.  <u>Post-Closing Receivables</u>.  If at any time after the Closing Date, Seller shall receive any payment from any federal or state agency or any other party for services rendered at the Nursing Home after the Closing Date, then Seller shall be obligated to remit such payments (or an amount equal to such payments) to Purchaser within three (3) business days.

9.2.4.  <u>Funds Held In Trust</u>.   To the extent either party receives any payments for accounts receivable of the other party, both parties acknowledge that the party receiving the payment belonging to the other party shall hold the payment in trust, that neither party shall have any right to offset with respect to such accounts receivable, and that the party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the other within three (3) business days after such receipt.

9.2.5.  <u>Accounts Payable</u>.   Except as expressly provided in this Agreement, all accounts payable for services provided or goods furnished for or at the Nursing Home prior to the Closing Date shall remain the sole responsibility and obligation of Seller.  All accounts payable for services provided or goods furnished for or at the Nursing Home on or after the Closing Date shall be the sole responsibility and obligation of Purchaser.  To the extent accounts payable have been accrued for a period that includes time both before and after the Closing Date, the parties hereto shall apportion the responsibility for payment of the same on a pro rata basis.  The parties hereto hereby agree to cooperate with each other and notify the merchants, suppliers or other third parties with respect to which of Seller or Purchaser bears responsibility for accounts payable of the Nursing Home based on the foregoing clauses.

9.3.    <u>Casualty/Condemnation</u>.

9.3.1.  Notice.  Seller shall promptly notify Purchaser of any casualty damage it becomes aware of or notice of condemnation that Seller receive prior to the Closing Date.

9.3.2.  Non Substantial Damage from Casualty.  If: (A) any portion of the Purchased Assets is damaged by fire or casualty after the Effective Date and is not repaired and restored substantially to its original condition prior to Closing, and (B) at the time of Closing the estimated cost of repairs is Five Hundred Thousand Dollars ($500,000) or less, as determined by an independent adjuster, and (C) for other reasons Purchaser has not otherwise elected to terminate pursuant to Section 9.4, Purchaser shall be required to purchase the Purchased Assets in accordance with the terms of this Agreement and at Seller's option, (x) Purchaser shall receive a credit at Closing of the estimated cost of repairs determined by the aforesaid independent adjuster and Seller shall retain all insurance claims and proceeds with respect thereto; or (y) at Closing Seller shall: (1) assign to Purchaser, without recourse, all insurance claims and proceeds with respect thereto (in which event Purchaser shall have the right to participate in the adjustment and settlement of any insurance claim relating to said damage), and (2) credit Purchaser at Closing with an amount equal to Seller' insurance deductible.  Seller shall have no liability or obligation with respect to the quantity or condition of the Purchased Assets and shall be released from any representation and warranty regarding same as a result of such fire or casualty.

9.3.3.  Substantial Damage from Casualty.  If, at the time of Closing, the estimated cost of repairing such damage is more than Five Hundred Thousand Dollars ($500,000), as determined by such independent adjuster, Purchaser may, at its sole option: (i) terminate this Agreement by notice to Seller within fifteen (15) days after such casualty (which shall be deemed a termination by Purchaser pursuant to Section 9.4.1(b) of this Agreement).

9.4.    Termination.

9.4.1.  Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the Closing Date (a) by mutual consent of Seller and Purchaser or (b) by either party as a result of the other party's failure to meet the conditions precedent to Closing contained herein in a timely manner or if such party is in breach of its obligations to consummate the transaction contemplated by this Agreement pursuant to the terms hereof, but only if the defaulting party fails to meet such condition or cure such breach with 10 days after receipt of written notice of such failure from the non-defaulting party delivered in accordance with Section 9.9.

9.4.2.  Purchaser or Seller may terminate this Agreement if the Court or any other court of competent jurisdiction shall have issued an order, decree or ruling or taken any other action enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree or other action shall have become final and nonappealable.

9.4.3.   In the event of Purchaser's termination of this Agreement pursuant to Section 9.4.1(b) or 9.4.2, the Purchaser's Deposit shall be returned to Purchaser.

9.5.   <u>Sales, Transfer and Documentary Taxes, Etc.</u>   In addition to the cost of requisite approvals necessary for Purchaser to obtain the licenses to operate the contemplated business, which shall be the sole responsibility of the Purchaser, Purchaser shall pay all federal, state and local sales, documentary and other transfer taxes, if any, due as a result of the purchase, sale or transfer of the Purchased Assets in accordance herewith whether imposed by law on Purchaser or Seller, and Purchaser shall file all necessary returns, reports and other documentation, if any, required by applicable law with respect to such taxes.  Further, Purchaser agrees to indemnify, reimburse and hold harmless Seller in respect of the liability for payment of or failure to pay any such taxes or the filing of or failure to file any reports required in connection herewith.

9.6.   <u>Expenses</u>.  Except as otherwise provided in this Agreement, each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this agreement and the consummation of the transactions contemplated hereby.

9.7.   <u>Contents of Agreement; Parties in Interest, etc.</u>  This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby.  It shall not be amended or modified except by written instrument duly executed by each of the parties hereto.  Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

9.8.   <u>Assignment and Binding Effect</u>.  This Agreement may not be assigned prior to the Closing by any party hereto without the prior written consent of the other party other than to the two single purpose entities which will be formed for purpose of taking assignment of the assets on the Closing Date.  Subject to the foregoing, all of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of Seller and Purchaser.

9.9.   <u>Notice</u>.  Any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and personally delivered, sent by first class registered or certified mail, postage prepaid, return receipt requested, sent by overnight national courier service, sent by facsimile, provided a hard copy is mailed on that day to the party for whom such notices are intended or sent by other means at least as fast and reliable as first class mail a written notice shall be deemed to have been given to the recipient party on the earlier of (a) the date it shall be delivered to the address required by this Agreement, (b) with respect to a facsimile, the date on which the facsimile is sent. Any and all notices referred to in this Agreement, or which any party desires to give the other shall be addressed as follows:

To Purchaser:        Maybrook Healthcare LLC

Attn: Mordy Lahasky
600 Broadway
Lynbrook, NY 11563

With a copy to (which shall not constitute notice):

Stacy J. Flanigan
Gutnicki LLP
4711 Golf Road
Suite 200
Skokie, IL 60076

To Seller:            Hutcheson Medical Center, Inc.
Attn: Ronald Glass, Trustee
100 Gross Crescent Circle
Fort Oglethorpe, GA 30742

With a copy to (which shall not constitute notice):

J. Robert Williamson
Scroggins & Williamson, P.C.
127 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia 30303

9.10.   <u>Georgia Law to Govern</u>.   This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of Georgia.

9.11.   <u>Jurisdiction; Venue</u>.   Any legal action or proceeding relating to any disputes between the parties hereto arising under this Agreement or with respect to its subject matter shall be brought exclusively in the Court and, by execution and delivery of this Agreement, Purchaser hereby accepts for itself and its affiliates, generally and unconditionally, the jurisdiction of the aforesaid court.   The parties hereto hereby irrevocably waive any objection, including any or based on the ground of forum non-conveniens which any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdiction.

9.12.   <u>Waiver of Jury Trial</u>.   THE PARTIES HERETO HEREBY   (1) IRREVOCABLY AND UNCONDITIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM OF ANY TYPE AS TO ANY MATTER ARISING DIRECTLY OR INDIRECTLY OUT OF OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH AND (2) AGREE THAT ANY PARTY MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED FOR AGREEMENT

BETWEEN THE PARTIES IRRECVOCABLY TO WAIVE TRIAL BY A JURY, AND THAT ANY DISPUTE OR CONTROVERSY OF ANY KIND WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED BY A JUDGE SITTING WITHOUT A JURY.

9.13.  <u>Schedules and Exhibits</u>.  All Exhibits and Schedules referred to herein are intended to be and hereby and specifically made a part of this Agreement.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date; provided, however, that the receiving party shall have five (5) days to review and object to such supplement in writing if such supplement would give rise to a termination under Section 9.1.5(b).  Failure to receive written objection within such five (5) days shall be deemed consent.

9.14.  <u>Severability</u>.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.15.  <u>Entire Agreement</u>.  This Agreement and the Exhibits and Schedules attached hereto constitute the entire Agreement between the parties with regard to the subject matter hereof.  No other understanding, inducement, representation or agreement shall be of any force or effect except as otherwise specifically provided for or referred to herein.  This Agreement may not be altered or amended except in writing signed by all parties.

9.16.  <u>Waiver</u>.  The failure of any party to insist assist upon strict compliance with any of the provisions of this Agreement by another party shall not constitute a waiver of such party's right to demand exact compliance with said provisions.

9.17.  <u>Execution by Counterpart Originals</u>.  This agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

9.18.  <u>Survival</u>. The representations and warranties of the Parties and the covenants and agreement of the Parties that by their terms are to be performed at or prior to Closing, contained in this Agreement or in any certificate or writing delivered in connection herewith, shall be extinguished by and shall not survive the Closing and shall not form the basis for any post-Closing claims or causes of action. The covenants and agreements contained herein that by their terms are to be performed after Closing (or that are expressly intended to survive Closing as set forth herein) shall survive the Closing for such terms.  For the avoidance of doubt, the covenants and agreements that shall survive the Closing include, but are not necessarily limited to, those set forth in sections 1.3, 1.5, 1.9.2, 1.9.3, 3.2.4.3, 4.1, 4.2, 5.2.5, 9.2.2, 9.2.5, 9.6 and 9.12.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

SELLER:

HUTCHESON MEDICAL CENTER, INC.

By: _____
Name: Ronald Glass
Its: As and Only as Trustee for the Estate of Seller

HUTCHESON MEDICAL DIVISION, INC.

By: _____
Name: Ronald Glass
Its: As and Only as Trustee for the Estate of Seller

PURCHASER:

MAYBROOK HEALTHCARE LLC

By: _____
Name: ___Ephraim M Iahasty___
Its: ___President___

## CERTIFICATE OF SERVICE

This is to certify that on this date I served a true and correct copy of the within and foregoing **Asset Purchase Agreement** by causing same to be deposited in the United States Mail with adequate postage affixed thereon and addressed to the following persons:

Martin P. Ochs
Office of the United States Trustee
362 Richard Russell Federal Building
75 Spring Street, SW
Atlanta, GA   30303

David B. Kurzweil, Esq.
John D. Elrod, Esq.
Greenberg Traurig, LLP
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA   30305

David E. Lemke, Esq.
Robert P. Sweeter, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street
Suite 2700
Nashville, TN   37219

Erich N. Durlacher
Burr & Forman, LLP
Suite 1100
171 17th Street NW
Atlanta, GA 30363

Gary W. Marsh
Dentons US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308

This 30th day of October, 2015.

SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building
127 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 893-3880
F: (404) 893-3886
E: rwilliamson@swlawfirm.com
   aray@swlawfirm.com
   hkepner@swlawfirm.com

 /s/ J. Robert Williamson
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

*Special Counsel for the Trustee*