**IT IS ORDERED as set forth below:**



**Date: November 5, 2015**

_____
**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **HUTCHESON MEDICAL CENTER, INC.,** | ) | **Jointly Administered Under** |
| **et al.,** | ) | **CASE NO. 14-42863-pwb** |
| | ) | |
| **Debtors.** | ) | |

**AMENDED ORDER (A) AUTHORIZING PROCEDURES FOR AND SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF THEIR ASSETS; (B) AUTHORIZING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, LEASES AND LICENSES AND ESTABLISHING CURE AMOUNTS WITH RESPECT TO THEREWITH; AND (C) APPROVING BID PROCEDURES GOVERNING, THE PROPOSED SALE, INCLUDING <u>PAYMENT OF EXPENSES REIMBURSEMENT AND BREAKUP FEE</u>**

Upon consideration of the motion dated October 13, 2015 (the "**Sale Motion**")[1], of Ronald

Glass, as duly appointed Chapter 11 Trustee (the "**Trustee**") for the bankruptcy estates of Hutcheson

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Medical Center, Inc. ("**HMC**") and Hutcheson Medical Division, Inc. ("**HMD**") (collectively, the "**Debtors**"), requesting (i) following an expedited hearing (the "**Procedures Hearing**"), entry of an order approving procedures for a sale and bidding process as hereinafter described to be used in connection with the proposed sale of some or substantially all of the assets of the Debtors' estates used in connection with the operation of the Medical Center (the "**Sale Assets**"), and (ii) following a final hearing, entry of an order approving the sale by the Trustee of the Sale Assets to the Stalking Horse Bidders or to one or more other Qualified Bidders; and based upon the record of the Procedures Hearing; and after consideration of any memoranda, objections, or other pleadings filed in connection with the Procedures Hearing; and after consideration of the arguments of counsel made at the Procedures Hearing; and upon the entire record of these cases; and it appearing that there is good cause for the approval of the bid procedures, as requested in the Sale Motion, modified by this Order, and attached hereto as <u>Exhibit A</u> (the "**Bid Procedures**"); and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.  The form and manner of notice of the Bid Procedures and the Procedures Hearing shall be, and hereby are, approved as sufficient and adequate notice. No other or further notice in connection with the entry of this Order is or shall be required.

B.  The Bid Procedures were proposed by the Trustee in good faith with the goal of maximizing the value of the Sale Assets for the benefit of all creditors of their estates.

C.  Approval of the Breakup Fee as set forth herein and in the Bid Procedures is a necessary and appropriate inducement to a prospective Stalking Horse Bidder (i) to make an initial offer which will serve as a "floor" for further bidding, and (ii) to negotiate and enter into a definitive

asset purchase agreement with the Trustee setting forth the terms and conditions pursuant to which a prospective Stalking Horse Bidder proposes to acquire the Sale Assets and to consummate the transactions contemplated thereby.

NOW, THEREFORE, IT IS HERBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Sale Motion is granted to the extent set forth in this Order solely as it relates to the Bid Procedures. Any ruling on the remaining relief requested in the Sale Motion, including authority for the Trustee to close a sale of any of the Sale Assets, is deferred until the Sale Hearing (as set forth below). Any objections to the Sale Motion relating to the proposed Bid Procedures that have not been resolved or withdrawn are hereby overruled. Any objections to the remaining relief requested in the Sale Motion are preserved until the Sale Hearing. The Bid Procedures, attached as Exhibit A, are hereby approved and shall be used in connection with the proposed sale of the Sale Assets.

2. The dates and deadlines set forth in the Bid Procedures are hereby approved, including the following:

   a. The Bid Deadline, by which all any Qualified Bid must be received by Guggenheim Securities, in the manner set forth in the Bid Procedures, is November 24, 2015, at 4:00 p.m. Eastern Time.

   b. The Auction will be conducted at the offices of Greenberg Traurig, at the address set forth in the Bid Procedures, on December 3, 2015, commencing at 10:00 a.m. Eastern Time.

   c. The Sale Hearing shall take place on December 14, 2015, commencing at 10:00 a.m., in Courtroom 1401, at the United States Bankruptcy Court for the Northern District of Georgia, 75 Ted Turner Drive, SW, Atlanta, GA 30303.

3. As soon as practicable following entry of this Order, the Trustee shall cause this Order, the Bid Procedures, any Stalking Horse Bid, any other Qualified Bid, and any other relevant information to be placed on the website of the Claims and Noticing Agent retained in this case, BMC Group, Inc., and available for viewing and downloading, at www.bmcgroup.com/hutcheson.

4. On or before November 5, 2015, the Trustee shall file a Notice of Executory Contracts and Unexpired Leases Subject to Assumption and Assignment (the "**Global Contract Notice**") identifying, to the extent known by the Trustee, any executory contracts or unexpired leases that the Trustee reasonably believes might be assumed by the Trustee and assigned to a Successful Bidder in connection with the sale, including, if known, the amount of the Cure Costs as determined by the Trustee for each of the contacts and leases specified therein. The Global Contract Notice shall be made available on BMC Group's website, and may be updated from time to time.

5. On or before November 6, 2015, the Trustee shall serve on each non-debtor party to the contracts and leases listed on the Global Contract Notice a separate notice (each an "**Individual Contract Notice**") notifying such non-debtor party that its contract or lease with the Debtors is subject to assumption and assignment, and specifying the Cure Cost, if known, with respect to such contract or lease, and providing that any such non-debtor party has the right to file an objection to the proposed assumption and assignment of its contract or lease, including any Cure Costs, up to two business days prior to the Sale Hearing. The Individual Contract Notice shall also specify that (a) the Trustee will work in good faith with any non-debtor party to a contract or lease to consensually resolve any disputes regarding the proposed Cure Costs without the need for such non-debtor party to file a formal objection, and (b) as soon as reasonably practicable following the Auction, the Trustee shall use his reasonable best efforts to send a separate notice to the non-debtor parties to contracts

and leases, and to post such notice on the BMC website (listed above), specifying whether the Trustee does or does not intend to assume and assign that non-debtor party's contract or lease to a Successful Bidder and updating any Cure Cost.

6. With respect to any executory contract or unexpired lease to be assumed and assigned to a Successful Bidder which the Debtors fail to notify at least five (5) days prior to the Sale Hearing as to be assumed and assigned to the Successful Bidder(s), the proposed assumption and assignment of such contract or lease shall not be heard or considered by the Court at the Sale Hearing absent consent of the non-debtor party to such contract or lease. Not later than fourteen (14) days following the Sale Hearing, Trustee shall file with the Court a final list of the contracts and leases to be assumed and assigned pursuant to the Sale, and such list may not be further modified without further order of the Court. A notice of filing such list shall be filed and served on all non-debtor parties to the contracts and leases, and, if necessary, a final hearing will be scheduled to approve the proposed assumption and assignment of such contracts and leases.

7. Objections (if any) to the Sale Motion or to the approval of any proposed sale of the Sale Assets shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following so as to be actually received on or before 5:00 p.m. Eastern Time on December 10, 2015: (i) counsel to the Trustee, J. Robert Williamson, Esq., Scroggins & Williamson, P.C., 1500 Candler Building, 127 Peachtree Street, N.E., Atlanta, Georgia 30303 (Facsimile: (404) 893-3886), (ii) counsel for the Committee, David B. Kurzweil, Esq., Greenberg Traurig, LLP, 3333 Piedmont Road, NE, Suite 2500, Atlanta, Georgia 30305 (Facsimile: (678) 553-7337 (iii) counsel for Regions Bank, Erich N. Durlacher, Esq., Burr & Foreman, LLP, Suite 1100, 171 17th Street, NW, Atlanta, Georgia

30363, and (iv) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Ted Turner Drive, SW, Atlanta, Georgia 30303, Attention: Martin Ochs, Esq. (Facsimile: (404) 331-4464). Any objection not filed and served in accordance with this paragraph 7 shall be deemed waived and shall be forever barred. Notwithstanding the foregoing, all objections of the Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger") to the remainder of the Sale Motion shall be preserved even if it does not file an objection to the Sale Motion, and nothing contained in this Order shall affect the rights, claims and defenses of Erlanger in Adversary Proceeding Number 15-04037-PWB.

8. Except as otherwise provided herein, the failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such party to the granting of the Sale Motion and the sale and transfer of the Sale Assets (including the assumption and assignment of any specified contracts or leases, including the payment of any specified Cure Costs) to the Successful Bidder(s).

9. Maybrook Healthcare LLC ("**Maybrook**") is hereby approved as the Stalking Horse Bidder for the SNF for purposes of the Breakup Fee (defined below) and other provisions of this Order and the Bidding Procedures; provided, however, that any Breakup Fee paid to Maybrook shall be in the amount of $216,000. Maybrook's offer for the SNF, as set forth in that certain asset purchase agreement (the "**Maybrook Agreement**") filed with the Court on October 30, 2015 [Docket No. 406], shall in all respects be deemed a Qualified Bid.

10. Subject to the execution of a definitive asset purchase agreement with a Stalking Horse Bidder on or before the date that is ten (10) days prior to the Auction, the Trustee is authorized and directed (a) to pay to the Stalking Horse Bidder an amount not to exceed $216,000 (the "**Breakup

**Fee**") in order to reimburse the Stalking Horse for its reasonable and documented out-of-pocket costs and expenses incurred in connection with, or related to (directly or indirectly), the transactions contemplated by such agreement; provided, however, that such Breakup Fee shall be due and payable only if the Trustee shall have consummated a sale or other transfer of substantially all of the Sale Assets specified in the agreement with the Stalking Horse Bidder to a Successful Bidder other than the Stalking Horse Bidder; provided, further, that no Breakup Fee shall be due and payable by the Trustee in the event that a material breach by the Stalking Horse Bidder of any representation or warranty contained in the agreement shall have occurred or the Stalking Horse Bidder fails to perform and comply with all of its covenants and agreements under the agreement, which breach or failure, as applicable, results in a valid termination of the agreement by the Trustee.

11. In the event that the Breakup Fee is payable pursuant to the preceding paragraph, the Breakup Fee shall be paid directly to the Stalking Horse Bidder out of the sale proceeds received from a sale of the Sale Assets to such Successful Bidder prior to the Court's determination of any allocation issues related to such proceeds, and shall upon payment not be deemed to be (a) property of the Debtors' estates, or (b) subject to the lien of any third party. Notwithstanding anything in this Order to the contrary, the issue of whether the Breakup Fee(s) should be paid solely from the portion of the sale proceeds attributable to Region's collateral or partially allocated between Regions' and Erlanger's collateral is not being determined in this Order, Erlanger having not consented thereto.

12. If the Breakup Fee becomes due and payable, its shall be paid directly to the Stalking Horse Bidder (without further order of the Court) at the closing of the sale of the Sale Assets.

13. The Bid Procedures (including the Breakup Fee) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Sale Assets, and will confer actual benefits

upon the Debtors' estates. The Bid Procedures (including payment of the Breakup Fee, if applicable) represent an exercise of the Trustee's sound business judgment and will facilitate an orderly sale process.

14. The purpose of the Bid Procedures and entry of this Order is solely to establish procedures for the sale of the Sale Assets.  Nothing contained herein or in the Bid Procedures shall serve as collateral estoppel or res judicata of any matter with respect to the Sale Hearing or any adversary proceeding or civil action, including any matter to be tried in Adversary Proceeding No. 15-04037.

15. The Trustee shall serve on all parties in interest in this Chapter 11 case a notice of the Sale Hearing and the posting of this Order, the Bid Procedures and other relevant documents related to the proposed sale of the Sale Assets on the BMC Group website, and such service shall constitute good and sufficient notice of the Auction, the Sale Hearing, and of the proposed sale of the Sale Assets.

**[END OF ORDER]**


Prepared and Submitted by:
SCROGGINS & WILLIAMSON, P.C.


  /s/ J. Hayden Kepner, Jr.
 J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616
1500 Candler Building
127 Peachtree Street, NE
Atlanta, Georgia 30303
T:  (404) 893-3880
F:  (404) 893-3886
E:  rwilliamson@swlawfirm.com
     hkepner@swlawfirm.com

*Special Counsel for Chapter 11 Trustee*

**Distribution List**

J. Robert Williamson
J. Hayden Kepner, Jr.
Scroggins & Williamson, P.C.
1500 Candler Building
127 Peachtree Street, NE
Atlanta, GA 30303

Martin P. Ochs
Office of the United States Trustee
362 Richard Russell Building
75 Spring Street, SW
Atlanta, GA 30303-3315

David B. Kurzweil
Greenberg Traurig, LLP
3333 Piedmont Road, NE, Suite 2500
Atlanta, GA 30303

Erich N. Durlacher
Burr & Forman, LLP
Suite 1100, 171 17th Street NW
Atlanta, GA 30363

David E. Lemke
Waller Landsden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219

# EXHIBIT A

## SALE AND BIDDING PROCEDURES

These Sale and Bidding Procedures (the "**Bid Procedures**") set forth the process by which Ronald Glass, as duly appointed Chapter 11 Trustee (the "**Trustee**") for the bankruptcy estates of Hutcheson Medical Center, Inc., ("**HMC**") and Hutcheson Medical Division, Inc., ("**HMD**") (hereinafter, collectively, the "**Debtors**"), will conduct the sale process and auction of substantially all of the Debtors' assets. Specifically, with the exception of the Excluded Assets (defined below), the Trustee is seeking to sell all of the Debtors' assets, real and personal, tangible and intangible, including the Debtors' 179-bed hospital ("**Hospital**") and the skilled nursing care facility ("**SNF**") that are located adjacent to each other on the Debtors' main campus located at 100 Gross Crescent Circle, Ft. Oglethorpe, Georgia, an outpatient surgery center and clinic that is located on Battlefield Parkway in Ringgold, Georgia ("**Surgery Center**"), miscellaneous clinics and facilities that are located both on and off the main campus, and all of the assets related to same (collectively, the "**Medical Center**"). Pursuant to the terms and conditions contained herein, the Trustee will seek to sell all or substantially all of the Debtors' assets, including the Hospital, SNF, the Surgery Center, other assets comprising the Medical Center, and the Debtors' interests in any related real property (the "**Sale Assets**").

The sale of the Sale Assets, including assumption and assignment of the Assumed Contracts, is subject to competitive bidding as set forth herein and approval of the sale, assumption and assignment pursuant to sections 363 and 365 of the United States Bankruptcy Code and Rules 2002, 6004, 6006, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Sale**"). Any prospective purchasers desiring to obtain a copy of the bidding materials may do so by complying with these Bid Procedures and contacting Guggenheim Securities, the Trustee's representative, at the address and contact information listed below:

Jay C. Jacquin
Managing Director
Guggenheim Securities
3414 Peachtree Road, NE Suite 960
Atlanta, GA 30326
404-585-2207 (ATL office)
jay.jacquin@guggenheimpartners.com

**BIDDING PROCEDURES**[1]

(i) Guggenheim Securities shall provide copies of the Bid Procedures, any draft or definitive asset purchase agreement filed with the Court by the Trustee, and available marketing materials to all prospective purchasers upon the execution of a nondisclosure and confidentiality agreement (the "**NDA**"). The Trustee shall allow prospective purchasers to conduct due diligence, including reasonable access to the Medical Center premises and management upon reasonable notice, provided however, that (a) each prospective purchaser shall have signed the NDA; (b) any due diligence investigation shall be conducted in a reasonable manner and without unduly interfering with or adversely affecting or impeding the patients, residents, employees or the conduct of the Debtors operations; and (c) there shall be no direct contact with any individual patient, resident or resident group, without prior written approval by the Trustee. Prospective purchasers may contact Guggenheim Securities at the address or other contact information listed above to arrange appointments to conduct due diligence.

(ii) On or before the Auction Date (defined below), prospective purchasers shall complete all due diligence.

(iii) In order to be considered as a Qualified Bidder, a potential bidder must submit a definitive asset purchase agreement (each such one defined as an "**APA**"), in a form reasonably acceptable to the Trustee, Regions Bank ("**Regions**") and the Official Committee of Unsecured Creditors (the "**Committee**"), setting forth all terms and conditions of a legally binding bid for the purchase of some or all of the Sale Assets, together to the extent reasonably practicable with a redlined copy of such APA marked against any draft or definitive asset purchase agreement previously filed with the Court by the Trustee. Such bid may provide for the acquisition of some or all of the Sale Assets. Bids must be received by Guggenheim on or before **November 24, 2015 at 4:00 p.m. Eastern Time** (the "**Bid Deadline**"). All bids must also satisfy the requirements set forth below to be considered a "Qualified Bid." Guggenheim shall immediately distribute all bids received to the Trustee, Regions, the Committee, to any Stalking Horse Bidders, and, in the discretion of the Trustee, after consultation with Regions and the Committee, any other Qualified Bidders. Counsel for the Trustee also shall file a summary of the bids with the Bankruptcy Court no later than 24 hours prior to the Auction.

(iv) In addition to submitting a bid as indicated above by the Bid Deadline, for a prospective bidder to be a Qualified Bidder, the bidder must furnish to Guggenheim, the Trustee, the Committee and Regions such information as necessary to evidence such bidder's compliance with the requirements of a "**Qualified Bidder**" as set forth hereinafter. The Trustee, subject to the recommendation of Guggenheim and the approval and consent of Regions and the Committee, shall determine whether a bidder

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Bidding Procedures Order.

2

is a "Qualified Bidder" based on whether such bidder has the financial wherewithal to consummate the purchase of the Sale Assets on which it intends to Bid if it is the Successful Bidder, and is likely to obtain the requisite approval from the State of Georgia and any other regulatory authorities to own and operate the subject facilities. In making such determination, Guggenheim, the Trustee, Regions, and the Committee may take into account whether the prospective Qualified Bidder is experienced at owning or operating the facilities similar to the Hospital, SNF, or Surgery Center, and has the expertise, reputation, personnel, finances, and overall ability to own and operate same. Any Qualified Bidder shall also provide to Guggenheim, the Trustee, Regions, and the Committee full disclosure of any other entity that will be participating in such bid.

(v)  In order to be considered a Qualified Bid, in addition to satisfying the above requirements, a bid must, unless otherwise agreed to by the Trustee, the Committee and Regions: (1) contain no financing or due diligence contingency; (2) be payable in cash, cashier's check, certified check and/or wire transfer fund, or any other immediately available funds in any demand or deposit account, each in currency of United States dollars (collectively, "**Cash**"), provided, however, the Trustee, with the consent of Regions and the Committee, may consider non-cash consideration with the value to be determined by the Trustee following consultation with Regions and the Committee; (3) be able to close within 10 days after receipt of all necessary regulatory approval, (4) identify with specificity all of the Sale Assets that the prospective Qualified Bidder wishes to purchase, whether real or personal, tangible or intangible; (5) indicate which third party contracts and unexpired leases, if any, of the Debtor it requests be assumed and assigned to such bidder; (6) be accompanied by a deposit in cash, in an amount of no less than $150,000 payable to the Trustee, provided, however, that any bid for any Sale Assets that include the SNF must be accompanied by a deposit, in cash, in an amount of no less than $350,000 ("**Deposit**") ; and ( 7 ) provide that such bid shall not be withdrawn prior to the Sale Hearing, and that such prospective Qualified Bidder's subsequent refusal or failure to comply with its bid after acceptance of same by the Trustee and approval by the Court shall entitle the Trustee to retain the Deposit. Such bids, if made by Qualified Bidders, shall be considered to be "**Qualified Bids**." Only Qualified Bids will be considered.

(vi) By submitting a bid, each prospective Qualified Bidder shall be deemed to acknowledge:

(i) that it is bound by these Bid Procedures; (ii) that it had an opportunity to inspect and examine the Debtors and all other pertinent information with respect to the Debtors before submitting such bid and that each such bid is based solely on that review and upon each bidder's own investigation and inspection; (iii) that is has consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of any transaction documents relating to the prospective Qualified Bidder's bid; (iv) in making its bid, such bidder is not relying upon any written or oral statements, representations or warranties of the Debtors, the Trustee, the Committee

3

or Regions, or their respective agents or representatives; and (v) that it consents to being an Individual Facility Backup Bidder (defined below) or a Business Enterprise Backup Bidder (defined below), as the case may be, if it not selected as the Successful Bidder at the conclusion of the Auction.

(vii) Deposits may be wired pursuant to instructions provided by Guggenheim or the Trustee. Deposits will be held in escrow by the Trustee, segregated in a separate account, and will be returned to such bidder (if such bidder is not the Successful Bidder within ten (10) business days following the entry of the Sale Order (as defined below).

(viii) The Sale Assets shall be sold AS IS/WHERE IS, free and clear of all liens, claims, interests, and encumbrances existing as of the date of the closing of the transactions contemplated by and in accordance with the Successful Bidder's Asset Purchase Agreement(s) and Sale Order (as defined below), subject only to title exceptions and other assumed liens, claims, interests and encumbrances that are mutually agreed to by the parties, and provided that Regions consents to the sale of the Sale Assets and the Trustee is otherwise authorized to convey such assets.

(ix) Prior to the commencement of the Auction (defined below), Guggenheim, the Trustee, the Committee and/or Regions may have discussions with each Qualified Bidder with respect to the terms and conditions of such Qualified Bids and Guggenheim will have selected a Qualified Bid acceptable to the Trustee, with the consent of Regions and the Committee, to become the opening bid at the Auction for each the Sale Assets, either in whole or in lots.

(x) The Trustee, in its discretion, after consultation with Guggenheim Securities, and the prior consent of Regions and the Committee, may agree that any one or more Qualified Bidders shall have stalking horse status and protections (each such individual party, a "**Stalking Horse Bidder**"), including a break-up fee and expense reimbursement in an amount of no more than $216,000, as approved by the Trustee with the consent of Regions and the Committee (the "**Break-Up Fee**"). The award of Stalking Horse Bidder status and protections may occur without further notice (other than an announcement at the commencement of the Auction) or order of the Bankruptcy Court. No Qualified Bidder other than a Qualified Bidder who is expressly designated as a Stalking Horse Bidder shall be entitled to a Break-Up Fee, or any other fee payable by the Trustee, the Debtors' estates, or Regions.

(xi) The auction for the Sale Assets will be conducted on **December 3, 2015 at 10:00 a.m. (ET)** at the offices of **Greenberg Traurig, 3333 Piedmont Road, NE, Suite 2500, Atlanta, GA 30305** (the "**Auction**"). Participation at the Auction shall be in person only. Only Qualified Bidders, Guggenheim, the Trustee, the Committee, Regions, the U.S. Trustee, and Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger") and each of their respective representatives and advisors (limited to three for Erlanger), may attend the Auction. Participation by telephone or other electronic means will be prohibited.

(xii) Each APA presented by Qualified Bidders, including the Stalking Horse Bidder, will ultimately be subject to Bankruptcy Court approval and is subject to higher and better offers at the Auction.

(xiii) Each Qualified Bidder, other than the Stalking Horse (each a "**Competing Bidder**"), will have the ability to increase its Qualified Bid prior to the commencement of the Auction. Thereafter, Competing Bidders and the Stalking Horse Bidders shall be permitted to submit and raise their bids with respect to the Sale Assets subject to their Qualified Bids until all Qualified Bidders cease bidding or raising their bids. To the extent there are more than one bid for the Sale Assets, the following procedures will apply:

(A) First, the Trustee will conduct an auction of each of the Hospital, SNF, and Surgery Center (each an "**Individual Facility**") in the order established by Guggenheim, in consultation with the Debtor, the Committee and the Trustee and announced at the commencement of the Auction. Only the Trustee, Regions, the Committee, and any Qualified Bidders that have submitted Qualified Bids, together with their respective advisors and attorneys, will be permitted to attend the Auction. Qualified Bidders for a specific Individual Facility (either as a single Individual Facility or as part of a bid for two or more Individual Facilities) may participate in the Auction with respect to such Individual Facility or, if there are competing Individual Facility Qualified Bids for multiple Individual Facilities, an Auction will be held for the sale of such multiple Individual Facilities together[2]. The purchase price for the initial competing bid (the "**Initial Competing Bid**") for an Individual Facility must be higher than the current purchase price submitted by any Stalking Horse Bidder of such Individual Facility by at least $100,000 (<u>plus</u> any Break-Up Fee to be paid to a Stalking Horse pursuant to the Bidding Procedures as set forth herein) and must be payable in Cash. Each successive bid must be in increments of at least $50,000. At the conclusion of all bidding for such Individual Facility, Guggenheim, the Trustee, Regions and the Committee shall select the party who has submitted the highest or otherwise best offer to purchase such Individual Facility (the "**Facility Successful Bidder" and the "Facility Successful Bid,**" respectively), each such Facility Successful Bid shall be acceptable to Regions in its sole discretion. After the conclusion of the Auction, the Trustee, Regions and the Committee reserve the right to designate one or more Qualified Bidders as a backup bidder(s) (each such party, an "**Individual Facility Backup Bidder**");

---

[2] A bidder for one Individual Facility may increase its bid at the Auction to compete against a bid that provides for the proposed acquisition of such Individual Facility, plus any other Individual Facility combined in such offer. For example, if a bidder has submitted a bid for Facility "A" and there exists another bid for both Facility "A" and Facility "B", the Qualified Bidder for Facility "A" can increase its bid on Facility "A" at the Auction and the Qualified Bidder for both Facility "A" and Facility "B" may participate in the Auction for Facility "A" only. Another example is if there is a Qualified Bid for Facilities "A," "B," and "C," and another Qualified Bid for Facilities "B" and "C," there will be an Auction for the sale of both Facilities "B" and "C" together

5

    (B)    After concluding the Auction for each Individual Facility, the Trustee will conduct an auction for all of the Sale Assets as a whole (the "**Business Enterprise**"). Prior to such auction, the Trustee, Regions and the Committee shall hold discussions with the Qualified Bidders to discuss proposals to combine existing bids for the entire Business Enterprise. The purchase price for the initial competing bid for the Business Enterprise must be higher than the current price submitted by the Stalking Horse Bidder for the Business Enterprise by an amount acceptable to the Trustee, Regions, and the Committee (plus any Break-Up Fee to be paid to a Stalking Horse Bidder for the Business Enterprise pursuant to the Bidding Procedures set forth herein) or if no such bid exists, the aggregate price of the offers of the Individual Facility Successful Bidder(s), and must be payable in Cash. Each successive bid must be in increments of at least $50,000. At the conclusion of all bidding for the Business Enterprise, the Trustee, Regions and the Committee shall select the party who has submitted the highest or otherwise best offer for the Business Enterprise (the "**Business Enterprise Successful Bidder,**" and the "**Business Enterprise Successful Bid,**" respectively). At the conclusion of the Auction, the Trustee, Regions, and the Committee reserve the right to designate a Qualified Bidder who bid on the Business Enterprise as a backup bidder for the Business Enterprise (the "**Business Enterprise Backup Bidder**").

    (C)    At the completion of bidding for the Business Enterprise, the Trustee, in consultation with Regions and the Committee, will determine which bid or bids represent the highest and best offers based upon the results of the Auction— *i.e.*, there will be a comparison of the aggregate purchase price for the Facility Successful Bids to the Business Enterprise Successful Bid and a determination shall be made as to which bid or combination of bids provide for the highest and best return on the Sale Assets (the "**Successful Bidder(s)**"). Such determination shall be made by the Trustee, with the advice of Guggenheim and in consultation with the Committee and Regions, and will be subject to Regions' consent, which shall not be unreasonably withheld.

(xiv)    Following the Auction, the Trustee reserves the right to require the Successful Bidder to deposit an additional amount in Cash that, when combined with the Deposit, equals five percent (5%) of the purchase price reflected in the final bid of the Successful Bidder(s) ("**Additional Deposit**"), which shall be due within one day of the Auction or as otherwise agreed to by the Trustee.

(xv)    The Successful Bidder(s) and the Trustee shall execute prior to the Sale Hearing the final asset purchase agreement(s) reflecting the terms of the winning bid(s) of the Successful Bidder(s) (the "**Successful Bidder Purchase Agreement**"), subject to Bankruptcy Court approval. The form and substance of the Successful Bidder Purchase Agreement shall be subject to the prior approval of Regions and the Committee, which approvals shall not be unreasonably withheld. The Successful

        Bidder Purchase Agreement(s) shall be filed with the Bankruptcy Court as soon as reasonably practicable but in no event later than 24 hours prior to the Sale Hearing.

(xvi)    The bids of any Facility Backup Bidder or Business Enterprise Backup Bidder shall remain open and irrevocable and subject to acceptance by the Trustee until the earlier to occur of (a) the successful completion of the sale with the Successful Bidder or (b) ten (10) days after the Outside Closing Date. No acts by the Trustee or Guggenheim or their respective agents or attorneys, whether in conjunction with the Sale Hearing or otherwise, shall affect the irrevocable nature of this bid.

(xvii)    **THE OFFER(S) BY THE SUCCESSFUL BIDDER(S) SHALL BE SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT.** No bids will be accepted or considered after the close of the Auction. A hearing to approve the Successful Bids (the "**Sale Hearing**") shall take place on **December 14, 2015, at 10:00 a.m**.. (ET). At such hearing the Trustee will seek, and the Bankruptcy Court will consider, approval of the sale to the Successful Bidder(s) and entry of an order authorizing and approving the transactions contemplated by the Successful Bidder Purchase Agreement(s) (the "**Sale Order(s)**"). No offers or bids will be accepted or considered at the Sale Hearing. The Sale Order(s) shall be acceptable in form and substance to the Trustee, Regions, the Committee, and the Successful Bidder(s).

(xviii)    The foregoing deadlines may be extended by the Trustee, with the consent of Regions (not to be unreasonably withheld), if it is determined that an extension of the above deadlines are necessary or desirable to maximize value and there is an adequate source of funds available to maintain the operations of the Debtors as currently operated. Notice of any extensions shall be filed with this Court and shall state the amended dates (the "**Sale Extension Notice**"). The Sale Extension Notice, if any, shall be served on all parties in interest, including Qualified Bidders.

(xix)    Notwithstanding anything to the contrary contained in the Bid Procedures, the Trustee and Regions reserve the right to terminate the sale and the sale process with respect to one or more of the Individual Facilities or the Business Enterprise, including the Auction of same, for any reason and at any time prior to the Sale Hearing, at which time the sale with respect to the subject Individual Facilities or Business Enterprise shall be so terminated.

(xx)    Except as otherwise agreed to by the Trustee and with the consent of Regions (not to be unreasonably withheld), and approved by the Bankruptcy Court, the closing(s) of the sale(s) of the Sales Assets ("**Closing(s)**") shall take place at the offices of Scroggins & Williamson, P.C. no later than ten (10) days following receipt of required regulatory approval relating to the Sale(s), but in no event later than sixty (60) days following the entry of the Sale Order and any other Order necessary for the Trustee to be able to convey the Sale Assets (the "**Outside Closing Date**") unless, after having used its best efforts, the Successful Bidder has been unable to obtain all necessary regulatory approvals by such date, in which case the Outside Closing Date may be extended for an amount of time reasonably necessary for the Successful Bidder to

        obtain such regulatory approvals, but in no event to a date later than an additional sixty (60) days . With respect to the Closing, time of performance by the Successful Bidder(s) is of the essence and the Successful Bidder must use its commercially reasonable best efforts to obtain any necessary regulatory approval as soon as possible.

        (i)     In the event the Successful Bidder(s) fails to close the sale prior to the Outside Closing Date, or the Court determines that the Successful Bidder is not seeking regulatory approval in good faith, it will forfeit its Deposit and any Additional Deposit, which Deposit and Additional Deposit shall immediately be turned over to the Trustee, and the subject Sale Assets may be sold to one or more Facility Backup Bidders or to a Business Enterprise Backup Bidder, subject to the provisions of the applicable APA of the Trustee and to the extent approved by Regions and the Committee (each, a "**Backup Bidder Agreement**"). The Trustee shall file a notice with the Court if he intends to consummate a transaction under a Backup Bidder Agreement.

(xxi)    These Bid Procedures shall be subject to any rights (1) of Regions to request the right to credit bid on some or all of the Sale Assets that are its collateral, pursuant to Section 363(k) of the Bankruptcy Code, and (2) of any party-in-interest to request that in order to be allowed to credit bid, Regions pay a deposit into escrow to cover (a) any carve-outs previously agreed to, (b) any reasonable, necessary costs and expenses of preserving or disposing of its collateral pursuant to Section 506(c) of the Bankruptcy Code,(c any Breakup Fee, and (d) any other payments or other obligations that might be ordered by the Court.

(xxii)    The proceeds from any Sale Assets (the "**Proceeds**") shall be remitted to the Trustee to be held in escrow, segregated in a separate account until further order of the Court. Distribution of the Proceeds shall be subject to all applicable orders of the Court.

(xxiii)    Nothing in these Bid Procedures shall be deemed an admission or acknowledgement by Regions that any of the Sale Assets or the Proceeds are subject to surcharge under Section 506(c) of the Bankruptcy Code, except to the extent previously ordered by the Court, nor shall they prejudice any party's rights to assert claims under 506(c) or to participate in appropriate distribution of the Proceeds, all of which rights shall be reserved.

(xxiv)    The Trustee may, with the prior consent of Regions and the Committee, modify the Bid Procedures in good faith and without further order of the Bankruptcy Court to promote the efficiency and fairness of the process.