IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| HUTCHESON MEDICAL CENTER, INC., | ) | Jointly Administered Under |
| et al., | ) | CASE NO. 14-42863-pwb |
| | ) | |
| Debtors. | ) | |

MOTION PURSUANT TO BANKRUPTY RULE 9019 FOR APPROVAL OF
SETTLEMENT AND COMPROMISE WITH CHATTANOOGA –HAMILTON
COUNTY HOSPITAL AUTHORITY D/B/A ERLANGER HEALTH SYSTEM, THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DEBTORS, CATOOSA
COUNTY, WALKER COUNTY, AND REGIONS BANK

COMES NOW, Ronald Glass, as duly appointed Chapter 11 Trustee (the "**Trustee**") for the bankruptcy estates of Hutcheson Medical Center, Inc., ("**HMC**") and Hutcheson Medical Division, Inc., ("**HMD**") (hereinafter, collectively, the "**Debtors**"), debtors and debtors-in-possession in the above-styled jointly administered case (the "**Case**"), pursuant to Rule 9019 of the FEDERAL RULES OF BANKRUPTCY PROCEDURE (the "**Bankruptcy Rules**"), and makes and files this Motion Pursuant to Bankruptcy Rule 9019 For Approval of Settlement and Compromise (the "**Motion**") with Chattanooga-Hamilton County Hospital Authority d/b/a/ Erlanger Health System ("**Erlanger**"), the Official Committee of Unsecured Creditors of Debtors (the "**Committee**"), Catoosa County ("**Catoosa**"), Walker County ("**Walker**"; together with Catoosa, the "**Counties**"), and Regions Bank ("**Regions**"; collectively, with the Trustee, Erlanger, the Committee, and the Counties, the "**Parties**"), requesting that the Court approve the terms of a compromise and settlement agreement between the parties substantially in the form of a Settlement Agreement

-1-

between the Parties, a copy of which is attached hereto as Exhibit "A" (the "**Settlement Agreement**"). [1] In support of this Motion, the Trustee shows the Court as follows:

### Background

1. On November 20, 2015 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

2. On or about December 2, 2014, an official committee of unsecured creditors (the "**Committee**") was appointed. On or about September 21, 2015, the Court entered an order approving the appointment of the Trustee.

### Jurisdiction and Venue

3. This Court has jurisdiction of this Motion and Notice pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue of the Debtors' Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Erlanger's Claim

4. Prior to the Petition Date, the Hospital Authority of Walker, Dade, and Catoosa Counties (the "**Authority**"), executed a line of credit note (the "**Line of Credit Note**") to evidence a $20,000,000 line of credit extended by Erlanger to the Authority to fund HMC's operations (the "**Line of Credit**"). In connection with the Line of Credit, the Authority executed a Deed to Secure Debt and Security Agreement in favor of Erlanger, granting Erlanger a lien and/or first position in approximately 53 acres of land, then owned by the Authority, located in the Counties and the buildings and improvements thereon.

5. The collateral included the Parkside Nursing Home building, the main hospital building, a connected physicians' office building, a building where a children's learning center operates,

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

certain undeveloped real property, and all related real property to these locations (collectively, the "**Erlanger Collateral**").

6. Additionally, HMC entered into a Joinder to Line of Credit Note, in favor of Erlanger, wherein HMC guaranteed the Line of Credit Note.

7. As additional security for the Line of Credit, the Authority, Walker, Catoosa, and Dade County entered into an Intergovernmental Agreement pursuant to which the Counties each agreed, upon an uncured default under the Line of Credit, to pay the Authority or its assigns an amount equal to one-half of the amounts due and payable under the Line of Credit, capped at $10,000,000 per County.

8. Prior to the Petition Date, Erlanger filed suit against the Authority and HMC (Case No. 4:14-cv-00040-HLM) (the **"District Court Action"**) in the United States District Court for the Northern District of Georgia (the "**District Court**"). Erlanger is seeking a judgment in the District Court Action in an amount totaling approximately $32,456,679.02. The Authority and HMC filed counterclaims against Erlanger in the District Court Action and have asserted various defenses and denied any liability to Erlanger under the Line of Credit Note and the Joinder Agreement.

## Regions' Claim

9. Prior to the Petition Date, pursuant to various loan documents and agreements between the Debtors, Regions, the Authority, and certain other parties, Regions lent millions of dollars to the Debtors and the Authority (the "**Regions Loans**").

10. In order to secure the repayment of the Regions Loans, the Debtors and the Authority provided Regions with a lien and/or security interest in HMC's interest in, *inter alia*, the lease agreement between the Authority and HMC for use of the medical center property, and all or substantially all of the Debtors' and the Authority's personal property including (i) Certificates of

Need and licenses for all facilities owned or operated by the Debtors, (ii) furniture, fixtures, and equipment (not leased from a third party), (iii) deposit accounts, (iv) inventory, (v) intellectual property, (vi) contracts and leases, (vii) general intangibles, (viii) all other tangible or intangible property owned by the Debtors and the Authority, and (ix) any other collateral identified in the loan documents and agreements.

11.   On April 30, 2015, Regions filed a proof of claim number 303 in this Case asserting a secured claim against HMC in the amount of $26,237,131.20. On June 25, 2015, Regions filed an amended proof of claim number 351 increasing the amount of its asserted secured claim to the amount of $26,263,448.08.

12.   On October 13, 2015, the Trustee filed a motion to sell all or substantially all of the Debtors assets to one or more purchasers free and clear of all liens, claims, interests, and encumbrances [Docket No. 367] (the "**Sale Motion**").

13.   On October 21, 2015, at a hearing related to the Sale Motion, the Trustee notified the Bankruptcy Court and all parties in interest in attendance at that hearing that the Authority might transfer all or part of the Medical Center Property to the Debtors.  On October 27, 2015, Erlanger filed a lawsuit against the Authority in the District Court (the "**District Court Injunction Action**") seeking, among other things, a preliminary injunction to prohibit the Authority from transferring the Medical Center Property to the Debtors, on the basis that such transfer: (i) would constitute a fraudulent transfer under the Georgia Uniform Fraudulent Transfers Act n/k/a the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-70 *et seq*., (ii) would violate the Hospital Authorities Act, O.C.G.A. § 31-7-400 *et seq*., and the Gratuities Clause of the Georgia Constitution, and/or (iii) should be enjoined under the terms of the All Writs Act 28 U.S.C. § 1651, and Erlanger has asserted substantially similar claims as counterclaims, cross-claims, and third-

party claims in the Adversary Proceeding (defined below).  On October 28, 2015, the Authority transferred the Medical Center Property to the Debtors, jointly, by Quitclaim Deed recorded on October 29, 2015, in the real property records of Walker County and Catoosa County.

14. On October 26, 2015, the Trustee initiated Adversary Proceeding Number 15-04037-pwb (the "**Adversary Proceeding**") by filing a complaint against Erlanger, Catoosa County, Dade County,[2] Walker County, and the Authority requesting, among other things, that the Bankruptcy Court: (i) authorize the Trustee to sell all or substantially all of the Debtors' assets and potentially certain non-debtor assets to one or more purchasers free and clear of all liens, claims, interests, and encumbrances, including any liens in favor of Erlanger or Regions pursuant to 11 U.S.C. §§ 105 and 363(f), and providing that any liens, claims, interests, and encumbrances would attach to the proceeds of the proposed sale; (ii) provide Erlanger with adequate protection under 11 U.S.C. § 363(e) through a replacement lien; and (iii) enter a declaratory judgment that the proposed sale of the Medical Center Property is the equivalent of a foreclosure sale under the deed to Deed to Secure Debt.  On or about November 9, 2015, Erlanger filed its answer, counterclaims, and cross-claims in the Adversary Proceeding (the "**Erlanger Counterclaims**").

15. On October 29, 2015, the District Court entered an order referring the District Court Injunction Action to the Bankruptcy Court, which action was filed in the Bankruptcy Court as Adversary Proceeding Number 15-04038-pwb, which Erlanger subsequently dismissed *without prejudice*.

16. On October 30, 2015, at a hearing on the bidding procedures related to the Sale Motion and on scheduling issues related to the Adversary Proceeding the Trustee announced that Maybrook Healthcare LLC ("**Maybrook**") was the stalking horse bidder for the SNF Sale

---

[2]  Dade County was subsequently dismissed from the Adversary Proceeding by the agreement of the parties.

-5-

Property for an aggregate purchase price of $7.2 million, and thereafter filed an asset purchase agreement with Maybrook for the purchase of the SNF Sale Property, subject to higher and better bids and Bankruptcy Court approval (the "**SNF Sale**").

17. On November 4, 2015, the Bankruptcy Court entered an order establishing procedures for sale of the Regions Collateral and the Medical Center Property [Docket No. 409] (the "**Bidding Procedures Order**").  On December 3, 2015, the Trustee conducted the Auction for certain of the Debtors' assets for which he had received Qualified Bids, and sold the SNF Sale Property for $7,200,000 and the CCC Real Property and the furniture, fixtures, and equipment located in the CCC Real Property which are part of Regions Collateral (the "**CCC Sale Property**") for $100,000 to Maybrook, subject to Bankruptcy Court approval.

18.  The Bankruptcy Court has scheduled a hearing at 10:00 a.m. on December 14, 2015 to consider approval of the sale of the SNF Sale Property and the CCC Sale Property to Maybrook, free and clear of liens, claims, interests, and encumbrances, together with such other relief requested in the Sale Motion, and to try the claims raised in the pleadings filed in the Adversary Proceeding, excepting any claim for equitable subordination asserted by the Trustee or Committee against Erlanger.

## Settlement Agreement

19.  In an effort to resolve certain of their disputes consensually, the Parties have engaged in settlement negotiations regarding, *inter alia*, certain of the claims and/or issues raised or asserted in connection with the District Court Action, the Adversary Proceeding, the Sale Motion, and other adversary proceedings and matters pending in the Case, all as described in more detail in the Settlement Agreement.  Those negotiations have resulted in a settlement and compromise being reached between the Parties.

20. The terms of the settlement and compromise are summarized as follows.[3]

    a. Erlanger and Regions will consent to a sale of the Erlanger Collateral, free and clear of liens, claims and interests, with such liens, claims and interests to attach the proceeds of sale, subject to the terms of the Settlement Agreement. Upon the sale of all or any portion of the Erlanger Collateral, the Trustee will make certain payments to Erlanger (the "**Settlement Payments**") in exchange for Erlanger releasing its lien on the property sold. The Settlement Payments which would be required to be paid to Erlanger are as follows: (a) $225,000 of the gross proceeds from any sale of the MOB Real Property; (b) $1,200,000 of the gross proceeds from any sale of the Hospital Real Property; (c) $80,000 of the gross proceeds from any sale of the Undeveloped Medical Center Property; (d) $1,290,000 of the gross proceeds from the sale of the SNF Sale Assets; and (e) $100,000 of the gross proceeds from the sale of the CCC Sale Assets.

    b. Except for the sale proceeds allocations set forth in the Settlement Agreement, Erlanger shall not be entitled to any distributions from the Trustee or the Debtors' Estates and all remaining claims of Erlanger shall be entirely subordinate to the claims of all other creditors in the Bankruptcy Cases. Upon consummation of the settlement Agreement, Erlanger will no longer participate in the Bankruptcy Cases other than to enforce its rights under the Settlement Agreement or the Required Sale Order. Notwithstanding anything in the Settlement Agreement to the contrary, Erlanger is not releasing and expressly reserves all claims and causes of action against the Authority including, but not limited to, those claims asserted in the District Court Action. Similarly, the Authority reserves all claims

---

[3] The description of the settlement terms in this Motion is a summary only, and the complete settlement terms are set forth in the Settlement Agreement attached hereto as Exhibit "A." In the event of any conflict between the language of this Motion and the the Settlement Agreement, the terms of the Settlement Agreement shall control.

and defenses asserted by it in the District Court Action. Erlanger also expressly reserves all claims and causes of action against Walker County and Catoosa County, including in connection with the Counties' guaranties of the Line of Credit Note and any legal obligations set forth in the Intergovernmental Agreement, the Deed to Secure Debt or any of the other Line of Credit Documents. As set forth in the Settlement Agreement, the releases granted under the Settlement Agreement are without rights and claims of any Party against non-Parties.

    c. As described in the Settlement Agreement, (i) Regions, the Debtors, the Trustee, the Estates and the Committee shall release claims against Erlanger, and (ii) Erlanger shall release claims against Regions, the Debtors, the Trustee, the Estates and the Committee

    d. As consideration for consenting to the Settlement Agreement, Erlanger will credit each consenting County's maximum potential liability to Erlanger, if any, under paragraphs 4(b) and 5(b) of the Intergovernmental Agreement with one-half of the actual cash proceeds disbursed to Erlanger from the sale of any of the Erlanger Collateral.

    e. The Court shall enter an Order and Judgment in the Adversary Proceeding holding, determining and declaring, *inter alia*, (i) that any sale or credit bid of all or a portion of the Erlanger Collateral under Section 363 of the Bankruptcy Code is the factual and legal equivalent to, and is accordingly deemed to be, a "non-judicial foreclosure," and completely, unconditionally, and irrevocably satisfies the "non-judicial foreclosure" requirements of the provisions of the Intergovernmental Agreement and the Deed to Secure Debt; and (ii) the amount(s) allocated and disbursed to Erlanger from the sale of or the Erlanger Credit Bid on some or all of the Erlanger Collateral constitutes "the fair market value of [such] property encumbered by the Deed to Secure Debt as of the date of non-

judicial foreclosure" within the meaning of the provisions of the Intergovernmental Agreement and the "fair market value of the Premises as of the date of the non-judicial foreclosure" within the meaning of the provisions of the Deed to Secure Debt.

    f.  After the Required Sale Order becomes final non-appealable order, the Court shall *sua sponte* dismiss all claims asserted against Walker County, Catoosa County and the Authority in the Adversary Action *without prejudice* under Fed, R. Civ. Pro. 41(a)(2).

    g.  In the event that: (i) the Bankruptcy Court enters the Required Sale Order and the District Court adopts the Bankruptcy Court's proposed findings of fact and conclusions of law in the Required Sale Order, and (ii) the SNF Sale closes, the Trustee shall immediately dismiss the HMC Appeal and the counterclaims asserted in the District Court Action *with prejudice*.

    h.  The settlement is contingent upon entry by the Bankruptcy Court of an order granting the Motion.

21. The Trustee believes that approval of the Settlement Agreement and entry of an order granting the Motion is in the best interests of the Debtors' estates and creditors.

22. Under the circumstances, settlement of the disputes under the terms proposed in this Motion and the Settlement Agreement is in the best interest of the Debtors' estates, and it comports with each of the standards for approval of compromises under controlling legal precedent. Those standards include: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the collection of any judgment obtained; (c) the complexity and likely duration of the litigation and the attendant expense, inconvenience, and delay; and (d) all other factors bearing on the wisdom of compromise, including the paramount interests of creditors. *See e.g., Wallis v.*

*Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Jackson Brewing Co.*. 624 F.2d 599, 602 (5th Cir. 1980).

23. In this case, all of the foregoing standards are met. The issues resolved by the proposed settlement are complex, and some involve issues of first impression. Litigating those issues will undoubtedly be expensive and time-consuming. Under the circumstances, the interest of creditors will be best served by approval of the proposed settlement and entry of the proposed Consent Order.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court (i) grant the Motion, (ii) enter an order approving the Settlement Agreement, and (ii) grant such other and further relief as may be just and proper.

This 11th day of December, 2015.

Respectfully submitted,

SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building
127 Peachtree Street, NE　　　/s/ J. Robert Williamson
Atlanta, GA 30303　　　　　　J. ROBERT WILLIAMSON
T: (404) 893-3880　　　　　　Georgia Bar No. 765214
F: (404) 893-3886　　　　　　ASHLEY REYNOLDS RAY
E: rwilliamson@swlawfirm.com　Georgia Bar No. 601559
　aray@swlawfirm.com　　　　J. HAYDEN KEPNER, JR.
　hkepner@swlawfirm.com　　Georgia Bar No. 416616

*Special Counsel for Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

  I hereby certify that I have this date served a copy of the foregoing **Motion** by filing through the ECF system and by e-mail as indicated below:

Martin P. Ochs
Office of the United States Trustee
Martin.P.Ochs@usdoj.gov

David E. Lemke
Waller Landsden Dortch & Davis, LLP
david.lemke@wallerlaw.com

Clifton M. Patty, Jr.
Patty & Young Attorneys at Law, LLC
skippattylawfirm@gmail.com

David B. Kurzweil
Greenberg Traurig, LLP
kurzweild@gtlaw.com

Sean C. Kulka
Arnall Golden Gregory LLP
sean.kulka@agg.com

  This 11th day of December, 2015.

|  |  |
|---|---|
|  | SCROGGINS & WILLIAMSON, P.C. |
| 1500 Candler Building |  |
| 127 Peachtree Street, NE | /s/ J. Robert Williamson |
| Atlanta, GA 30303 | J. ROBERT WILLIAMSON |
| T: (404) 893-3880 | Georgia Bar No. 765214 |
| F: (404) 893-3886 | J. HAYDEN KEPNER, JR. |
| E: rwilliamson@swlawfirm.com | Georgia Bar No. 416616 |
|  hkepner@swlawfirm.com | ROBERTO BAZZANI |
|  rbazzani@swlawfirm.com | Georgia Bar No. 609464 |
|  | *Special Counsel for Trustee* |