

**IT IS ORDERED as set forth below:**

**Date: December 15, 2015**

_____

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | CHAPTER 11 |
| HUTCHESON MEDICAL CENTER, INC., et ) | |
| al., ) | Jointly Administered Under |
| ) | Case No. 14-42863-pwb |
| *Debtors*. ) | |
| _____ ) | _____ |
| ) | |
| RONALD L. GLASS, as Chapter 11 Trustee, ) | Adversary Proceeding No. 15-04037 |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| vs. ) | |
| ) | |
| CHATTANOOGA-HAMILTON COUNTY ) | |
| HOSPITAL AUTHORITY, d/b/a ) | |
| ERLANGER HEALTH SYSTEM, ) | |
| CATOOSA COUNTY, DADE COUNTY, ) | |
| WALKER COUNTY, and HOSPITAL ) | |
| AUTHORITY OF WALKER, DADE, AND ) | |
| CATOOSA COUNTIES, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

8372749v2

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
<u>**RESOLVING ADVERSARY ACTION**</u>

Based on the facts stipulated to and the terms of that certain Settlement Agreement (the "Agreement"), [1] dated December 11, 2015, and pursuant to such Agreement, as well as evidence presented at the December 14, 2015 Hearing (the "Settlement Hearing") on the Trustee's Motion to Compromise, filed pursuant to Fed. R. Bankr. P. 9019 [Docket No. 492] (the "Settlement Motion") and Notice of Settlement Motion [Docket No. 493], including, without limitation, the declaration of Mr. Gerald V. Rasmussen, MAI, FRICS, an Executive Managing Director in the Senior Housing/Healthcare Industry Group of Cushman & Wakefield ("Mr. Rasmussen") and the testimony of Mr. Jay Jacquin ("Mr. Jacquin"), a managing director with Guggenheim and Associates, Inc. ("Guggenheim") proffered at the Settlement Hearing, the Trustee's Court approved investment bankers,[2] the arguments of counsel at the Settlement Hearing, the entire record in these Bankruptcy Cases, and for good cause shown, the Court makes the following FINDINGS OF FACT, and hereby FINDS and DETERMINES that:

1. On December 14, 2015, the Court approved the Agreement by and among Ronald Glass, as duly appointed Chapter 11 Trustee (the "Trustee") for the jointly administered bankruptcy estates (the "Estates") of Hutcheson Medical Center, Inc. ("HMC") and Hutcheson Medical Division, Inc. ("HMD"; together with HMC, the "Debtors"), Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger"), the Official Committee of Unsecured Creditors of Debtors (the "Committee"), Walker County Georgia ("Walker"), Catoosa County Georgia ("Catoosa"; together with Walker, the "Counties"), and Regions Bank,

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in the Agreement.

[2] Once the Trustee was appointed, the Trustee received Court approval to continue the Debtors' employment of Guggenheim to market the Estates' assets and to otherwise maximize their value.

8372749v2

N.A. ("Regions"; together with the Trustee, Erlanger, the Committee, Walker and Catoosa, each a "Party" and collectively, the "Parties"). These findings of fact and conclusions of law are entered as part of the approval of the settlement set forth in the Agreement. In the event of any conflict between the Agreement and these Findings of Fact and Conclusions of Law, the terms of the Agreement shall control.

2. The Hospital Authority of Walker, Dade, and Catoosa Counties (the "Authority") and HMC are parties to a lease, dated January 24, 1995, with a 40 year term, whereby HMC leases certain real property from the Authority on which to operate a hospital, a nursing home, and related facilities (the "Lease"). The Lease was tendered into evidence. The Lease covers approximately 53 acres of land in Walker and Catoosa Counties and the buildings and improvements thereon, including the acute care hospital known as the "Hutcheson Medical Center," a connected office building, the Parkside Nursing Home (the "SNF"), a childcare center and several smaller buildings (collectively, the "Medical Center Property"). There are currently approximately 20 years remaining on the term of the Lease.

3. Thereafter, in 2011, Erlanger, as lender, and the Authority, as a borrower, entered into a Line of Credit Note in the principal amount of $20,000,000.

4. In connection with the execution of the Line of Credit Note, which was tendered into evidence, the Authority executed a deed to secure debt, dated April 25, 2011 (the "Deed to Secure Debt"), which granted Erlanger a security interest in the Medical Center Property.

5. Pursuant to the terms of a Joinder Agreement, which was tendered into evidence, HMC guaranteed the amounts due by the Authority to Erlanger under the Line of Credit Note.

6. The Deed to Secure Debt provides that:

> [I]n the event of a default, either under the [Line of Credit Note] or this instrument, which remains uncured after all required notices, [Erlanger] shall first

3

      exercise its right of non-judicial foreclosure against the [Medical Center Property] as described in Paragraph 8 hereof prior to seeking any payment from the Counties under the Intergovernmental Agreement.

(*See* Deed to Secure Debt §8(c).)

      7.    In connection with the Line of Credit Note and the Deed to Secure Debt, Walker County, Catoosa County, Dade County, and the Authority entered into an Intergovernmental Agreement, which was tendered into evidence. Pursuant to Sections 4 and 5 of the Intergovernmental Agreement, both Walker County and Catoosa County agreed to guaranty the indebtedness to the Authority or its assigns under the Line of Credit Note up to a maximum of $10 million per county. Each of the Counties had the option, however, to "elect to allow [Erlanger] to exercise the right of non-judicial foreclosure upon the property encumbered by the [Deed to Secure Debt]." The Intergovernmental Agreement also provides that, if either Walker or Catoosa County elected that option, the electing County "shall not be liable for any payments [thereunder] until such time as the non-judicial foreclosure is completed . . . ."

      8.    In connection with a lawsuit it filed in the United States District Court for the Northern District of Georgia (the "District Court"), styled as *Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System v. Hospital Authority of Walker, Dade and Catoosa Counties and Hutcheson Medical Center, Inc.*, Case No 4:14-cv-00040-HLM (the "District Court Action"), in which Erlanger seeks recovery of the principal, interest, and late fees due under the Line of Credit Note, Erlanger attempted to foreclose on the Medical Center Property, most recently on January 6, 2015. While the District Court ultimately held that Erlanger had the right to foreclose, it stayed that foreclosure pending an appeal by HMC and the Authority.

4

9. On October 28, 2015, the Authority executed a Quitclaim Deed transferring its remaining fee simple interest in the Medical Center Property to the Debtors' Estates (the "Transfer"), to which Erlanger objected and later sought to avoid on several grounds.

10. In order to: (i) achieve an equitable result for all interested parties, including Erlanger, (ii) implement the compromise and settlement reflected in the Agreement, and (iii) promote the public interest in allowing the SNF, a portion of the Medical Center Property where over 100 senior citizens reside and which employs numerous local citizens, to remain open and operating as a going concern, and pursuant to the terms of the Agreement, the Court finds that the Transfer was and is effective, is not void or avoided, and the property thus transferred is property of the Debtors' Estates. The Court further finds the Transfer, which will allow the Trustee to attempt to maximize the value of the SNF and other assets of the Estates, is in the best interests of the Estates, all other parties in interest, and the public interest. Moreover, where, as here, adequate protection is required, the Court can use the provisions of the Bankruptcy Code, including its equitable powers, to fashion an appropriate remedy (s*ee* 11 U.S.C. §§ 105(a), 361, and 363(e)), and Erlanger's interests can be adequately protected as set forth in the Agreement and this Order.

### THE DEBTORS' AND TRUSTEE'S EFFORTS TO MARKET THE MEDICAL CENTER PROPERTY

11. In order to conduct a non-judicial foreclosure under Georgia law, a party with a security interest in real property must provide at least 30 days' notice to the defaulted party or parties and advertise the subject property for non-judicial foreclosure in the legal organ where the real property to be foreclosed upon is located one time per week for four consecutive weeks directly preceding the foreclosure sale. Thereafter, a non-judicial foreclosure sale may proceed

5

on the first Tuesday of the month following such notice and publication in the county or counties where the property is located.

12. Erlanger previously noticed the Medical Center Property for non-judicial foreclosure on two occasions, the last time in December 2014 for a contemplated January 2015 sale, which was stayed by the District Court's December 4, 2014 Order.

13. The Trustee's investment banker, Guggenheim, has conducted nearly 6-months of extensive marketing efforts to a targeted list of approximately 180 potentially interested parties, which includes financial and healthcare sponsors in the distressed healthcare space, as well as hospital, nursing home, continuing care retirement community, surgi-center, and cancer center operators.

14. On October 13, 2015, the Trustee filed a motion to sell all or substantially all of the Debtors assets to one or more purchasers free and clear of all liens, claims, interests, and encumbrances [Docket No. 367 ] (the "Sale Motion").

15. After the Trustee's bidding procedures (the "Bidding Procedures") were filed and approved by an order of the Court dated November 4, 2015 [Docket No. 409] (the "Bidding Procedures Order"), Guggenheim re-contacted the potentially interested parties to determine whether any of them might be interested in bidding on the non-SNF portion of the Estates' assets or bidding on the entirety of the Medical Center Property.

16. Guggenheim continued to market the Estates' assets through and after the November 30, 2015 deadline for the receipt of qualifying bids and the scheduled December 3, 2015 auction of the Debtors' assets (the "Auction") both established under the Bidding Procedures Order, and at all times has continued to try to maximize value of the Estates' assets.

8372749v2

17. Guggenheim is an experienced professional marketer of distressed assets, and Mr. Jacquin is an expert in marketing distressed assets, including property owned by chapter 11 bankruptcy estates. Based on the evidence, it appears that Guggenheim utilized substantial efforts, and was incentivized (in part due to a Court approved transaction fee), to search for maximum value for the Debtors' assets, including the Medical Center Property. The efforts utilized by Guggenheim and the Trustee were (i) substantially more likely to locate viable potential purchasers, and substantially more likely to yield a favorable purchase price, than would have been obtained in the context of a properly noticed non-judicial foreclosure sale; and (ii) that the marketing and sale procedures utilized by Guggenheim and the Trustee alerted all or virtually all of the potential purchasers for the Medical Center Property to the availability of that property for sale as well as a mechanism for them to purchase such property free and clear of inferior liens and interests.

18. Through Guggenheim's marketing efforts and the Bidding Procedures, including the Auction and the Settlement Hearing, the Debtors and the Trustee have provided all of the obligors and guarantors of the Line of Credit Note, including the Counties, with adequate notice of the proposed sale of the Medical Center Property that is equal to or greater than the notice that is required for non-judicial foreclosure under applicable Georgia law.

### THE IMPACT OF THE LEASE ON VALUATION

19. After considering the positions advanced by the Parties, the Court determines that if Erlanger were permitted to foreclose its interest in the Medical Center Property by exercising its rights under the Deed to Secure Debt, any purchaser at the foreclosure, including Erlanger, likely would take the Medical Center Property subject to the rights of HMC (or the transferees or assigns of its leasehold interest) under the Lease. See, e.g., *Raiford v. Dept. of Transp.*, 206 Ga.

8372749v2

App. 114 (1992); *Wright v. Home Beneficial Life Ins. Co.*, 155 Ga. App. 241 (1980). Accordingly, if Erlanger were permitted to foreclose its interest in the Medical Center Property by exercising its rights under the Deed to Secure Debt, any purchaser at the foreclosure, including Erlanger, would take the Medical Center Property subject to the rights of HMC (or the transferees or assigns of its leasehold interest) under the Lease.

20. Were a non-judicial foreclosure permitted to take place, the inevitable litigation regarding whether the Lease survived such foreclosure would materially and adversely affect the willingness of any potential purchaser to bid on the Medical Center Property and, likewise, would reduce the amount any purchaser would be willing to pay for Erlanger's interest in the Medical Center Property.

21. In addition, the Court finds that permitting the sale of the Medical Center Property pursuant to the terms of the Agreement will likely lead to a more favorable valuation of the property than could be obtained had it been sold at any non-judicial foreclosure.

### THE AMOUNT ALLOCATED TO ERLANGER FOR ITS SECURITY INTEREST IN THE MEDICAL CENTER PROPERTY IS THE FAIR MARKET VALUE OF ITS SECURITY INTEREST

22. Excluding the SNF and the approximately 4.9 acres of the real property in which the SNF sits, the Medical Center Property includes the following: the main hospital (including the women's center and engineering maintenance structures) (approximately 400,258 square feet) and related real property (the "Hospital Medical Center Property"); the physicians' office space (approximately 13,204 square feet and related real property (the "Office Medical Center Property")); a children's learning center (approximately 5,376 square feet and related real property; (the "Child Center Medical Center Property")) the additional acres of undeveloped real property (the "Undeveloped Medical Center Property").

8

8372749v2

23. Mr. Rasmussen's Declaration addresses the fair market value of the Medical Center Property encumbered by the Deed to Secure Debt granted to Erlanger. Mr. Rasmussen is a Georgia Certified General Appraiser, as well as a member of the Appraisal Institute and the Royal Institute of Chartered Surveyors. Mr. Rasmussen's curriculum vitae was submitted into evidence. Mr. Rasmussen is an expert appraiser with a specialty in the valuation of healthcare assets, and the Court finds Mr. Rasmussen's testimony to be credible.

24. The Agreement provides that Erlanger will receive $1.39 million of the $7.3 million in proceeds from the sale of the SNF and Child Center Medical Center Property to Maybrook. The Court finds that this allocation is consistent with Mr. Rasmussen's testimony as to value of the SNF and the Child Center Medical Center Property, as encumbered by the Lease, and is equal to or greater than the fair market value of the land and buildings and improvements comprising the SNF and the Child Center Medical Center Property encumbered by the Deed to Secure Debt granted to Erlanger.

25. The Agreement further provides that if a sale of the Hospital Sale Property is approved by the Bankruptcy Court within the next four months, Erlanger will receive the following allocation from the proceeds: (a) $225,000 of the gross proceeds from any sale of the MOB Real Property; (b) $1,200,000 of the gross proceeds from the sale of the Hospital Real Property; and (c) $80,000 of the gross proceeds from any sale of the Undeveloped Medical Center Property. The Court finds that this allocation is consistent with Mr. Rasmussen's testimony as to fair market value of these portions of the property, as encumbered by the Lease, and is equal to or greater than the fair market value of the property encumbered by the Deed to Secure Debt granted to Erlanger.

8372749v2

26. The Agreement further provides that, if no sale of the remaining portions of the Medical Center Property is approved by the Bankruptcy Court within the next four months, Erlanger or its designee may credit bid for the unsold Medical Center Property in the amounts set forth in the Agreement and, if Erlanger is the successful bidder, it may thereafter retain the proceeds of any subsequent sale of such property by Erlanger without credit to any party under the Agreement. The Court finds that the enumerated amounts of Erlanger's potential credit bids are equal to or greater than the fair market value of the subject property encumbered by the Deed to Secure Debt.

27. Based on the foregoing, the cash and other consideration allocated to Erlanger for its lien in the Medical Center Property constitutes "the fair market value of the property encumbered by the Deed to Secure Debt as of the date of non-judicial foreclosure" within the meaning of the provisions of the Intergovernmental Agreement and "the fair market value of the Premises as of the date of non-judicial foreclosure" within the meaning of the provisions of the Deed to Secure Debt.

28. In order to provide Erlanger with adequate protection of all of its rights under the Line of Credit Documents, including its interest in the Medical Center Property and its contractual rights if any against Walker and Catoosa Counties, the sale of the Medical Sale Property under 11 U.S.C. § 363(f) to the purchasers, including Maybrook and potentially Erlanger (on account of its credit bid), free and clear of Erlanger's lien rights, is the factual and legal equivalent to, and is accordingly deemed to be, a "non-judicial foreclosure," and completely and unconditionally satisfies the "non-judicial foreclosure" requirements of the provisions of the Line of Credit Documents, thereby permitting Erlanger to proceed against the

8372749v2

Counties on their contractual guaranties if any of the Hospital Authority's indebtedness to Erlanger.

## CONCLUSIONS OF LAW

NOW, THEREFORE, based on the foregoing FINDINGS OF FACT, the evidence presented at the Settlement Hearing, including the testimony of Mr. Rasmussen and Mr. Jacquin, the Agreement, the entire record in these Bankruptcy Cases, and for good cause shown, the Court makes the following CONCLUSIONS OF LAW and it is hereby ORDERED that:

1. The Court determines and declares (i) that any sale or credit bid of all or any portion of the Medical Center Property under Section 363 of the Bankruptcy Code is the factual and legal equivalent to, and is accordingly deemed to be, a "non-judicial foreclosure," and completely, unconditionally, and irrevocably satisfies the "non-judicial foreclosure" requirements of the provisions of the Intergovernmental Agreement and the Deed to Secure Debt; (ii) the amount(s) allocated and disbursed to Erlanger from the sale of or the Erlanger Credit Bids on some or all of the Medical Center Property constitute "the fair market value of [such] property encumbered by the Deed to Secure Debt as of the date of non-judicial foreclosure" within the meaning of the provisions of the Intergovernmental Agreement and the "fair market value of the Premises as of the date of the non-judicial foreclosure" within the meaning of the provisions of the Deed to Secure Debt; and (iii) that the foregoing determinations are (A) an integral, essential aspect of any sale of the Medical Center Property under the Bankruptcy Code, without which the sale and the Court's approval of the sale would not take place; (B) an essential aspect of the Court's conclusion that Erlanger's rights are adequately protected within the meaning of Sections 361 and 363(e) of the Bankruptcy Code, and that the sale and its impact on interested parties is otherwise valid and satisfies the requirements for

8372749v2

approval under Section 363 of the Bankruptcy Code; and (C) being relied upon by Erlanger and any third party purchaser, including Maybrook, absent which Erlanger and any third-party purchaser, including Maybrook, would suffer material and irreparable harm.

    2.    The Settlement Motion is **APPROVED**.

    3.    As set forth in the Agreement, nothing herein shall be binding upon or prejudice the rights of any party or other person in the event that (i) the Agreement is not approved, (ii) the Agreement is determined to be unenforceable, or (iii) any conditions to the effectiveness of the Agreement are not met.

    4.    The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of these findings of fact and conclusions of law.

**\*END OF DOCUMENT\***

PREPARED AND PRESENTED BY:

ARNALL GOLDEN GREGORY LLP

By: */s/ Sean C. Kulka*
    Sean C. Kulka
    Ga. Bar No. 648919
    171 17th Street, N.W., Suite 2100
    Atlanta, GA 30363-1031
    Tel. 404.873.8682
    sean.kulka@agg.com

    *Attorneys for Chattanooga-Hamilton County Hospital Authority*
    *d/b/a Erlanger Health System*

8372749v2